IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| HARRY ANDRIANOS, *et al*, on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. _____ |
| VOLKSWAGEN GROUP OFAMERICA, INC., VOLKSWAGEN AG, AUDI AG, AUDI OF AMERICA, LLC, DR. ING h.c.F. PORSCHE AG, PORSCHE CARS NORTH AMERICAN, INC., MARTIN WINTERKORN, MATTHIAS MÜLLER, MICHAEL HORN, RUPERT STADLER, ROBERT BOSCH GmbH, ROBERT BOSCH, LLC. And VOLKMAR DENNER, | ) ) ) ) ) ) ) ) ) ) ) | Jury Demand |
| Defendants. | ) | |

## CONSOLIDATED CONSUMER COMPLAINT

Plaintiffs, by and through their attorneys, STRONG LAW OFFICES, bring this action on behalf of themselves and all others similarly situated, against (1) the defendants collectively known as "Volkswagen": Volkswagen Aktiengesellschaft ("VW AG"), Volkswagen Group of America, Inc. ("VW America") (together, "VW"), Audi Aktiengesellschaft ("Audi AG"), Audi of America, LLC ("Audi America") (together, "Audi"), Dr. Ing. h.c.F. Porsche Aktiengesellschaft ("Porsche AG"), Porsche Cars North America, Inc. ("Porsche America") (together, "Porsche"), Martin Winterkorn ("Winterkorn"), Matthias Müller ("Müller"), Michael Horn ("Horn"), and Rupert Stadler ("Stadler"); and (2) the defendants collectively known as "Bosch": Robert Bosch GmbH, Robert Bosch, LLC, and Volkmar Denner (together, "Bosch") (Note: VW AG, Audi AG, and Porsche AG are sometimes collectively referred to as the "German Volkswagen Defendants," and VW America, Audi America, and Porsche America are collectively referred to as the "American Volkswagen Defendants." Winterkorn, Horn, Müller, and Stadler are collectively referred to as the "Volkswagen Individual Defendants," and inclusively with Denner as the "Individual

Defendants).  Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## INTRODUCTION

1.      This case arises out of one of the most brazen corporate crimes in history, a cautionary tale about winning at any cost.  Volkswagen cheated its way to the top of the automotive food chain and spared no victim along the way, targeting its customers, U.S. and foreign regulators, and even the very air we breathe.  The linchpin of Volkswagen's fraudulent scheme was the deliberate use of a "defeat device," a secretly embedded software algorithm that, as Volkswagen has since admitted, was designed and installed to cheat emission tests, thereby fooling the Environmental Protection Agency ("EPA"), among other regulators, into approving for sale hundreds of thousands of non-compliant cars (the "Class Vehicles," defined below).  For years, Volkswagen got away with it, and the Class Vehicles were sold at record numbers into our stream of commerce.  Once on the roads, these cars spewed millions of tons of harmful nitrogen oxide ("NOx") pollutants into our air at a rate of up to 40 times the legal limit.  All the while, Volkswagen pitched itself to the American Public as the world's foremost innovator of "clean" diesel technology, duping hundreds of thousands of environmentally-conscious consumers who were willing to pay a premium for "clean" diesel vehicles.

2.      Fraud fueled Volkswagen's success, and its only real "clean" diesel innovation was how it played dirty.  Its ingeniously designed defeat devices, software installed on engine management systems supplied by defendant Bosh, detected when its dirty diesel engines were being tested in a laboratory or smog station and trigged performance-sapping controls to simulate compliance with emissions laws.  But, when the test ended and the driver returned to the road under normal operation and use, the performance, and the illegal belch of pollution, returned.  Everything about Volkswagen's fraudulent scheme was coolly calculated, as defendant Horn, CEO of VW America, confessed in the Fall of 2015 at Congressional hearings:

"[The defeat device] was installed for this purpose, yes."  (See Bill Chappell, '*It Was Installed For This Purpose,' VW's U.S. CEO Tells Congress About Defeat Device*, NPR (Oct. 8, 2015)).

3.      Volkswagen promised low emission, environmentally friendly vehicles, with high fuel economy and exceptional performance.  Consumers believed Volkswagen and bought Volkswagen's VW-, Audi-, and Porsche-branded "clean" diesel vehicles in record numbers.  In fact, during the relevant time period, Volkswagen sold more diesel cars in the U.S. than every other automaker combined.  From 2009 to 2015, Volkswagen sold and/or leased approximately 580,000 dirty diesels that its defeat device disguised as clean.  In doing so, Volkswagen secretly turned the most environmentally-conscious consumers into some of the biggest polluters on the road, and charged them a premium in the process.

4.      As a result, there are over half a million cars on American Roads with illegal emission systems that never should have left the factor, and would not have, but for Volkswagen's fraudulently obtained EPA Certificates of Conformity ("COCs"), as well as California Air Resources Board ("CARB") Executive Orders ("EOs").  Since the revelation of Volkswagen's scheme, the Department of Justice ("DOJ") has filed a complaint alleging numerous violations of the Clean Air Act ("CAA"), California and other state attorneys general have announced investigations or filed lawsuits concerning defendants' fraudulent scheme, and countless other government entities have launched criminal and civil investigations around the globe.

5.      Volkswagen's fraud has also taken a human toll.  According to statistical models, the pollution spewed by the Class Vehicles will cause "somewhere between 16 and 94 deaths over seven years, with the annual count increasing more recently as more of the diesels were on the road.  (Seth Borenstein, *AP analysis:  VW evasion will likely lead to dozens of deaths*, Associated Press (Oct. 5, 2015)).  Meanwhile, a peer-reviewed study by researchers at MIT and Harvard University has estimated that the pollution from the illegal Vehicles will cause 59 early deaths and result in environmental costs exceeding $450 million.  (Stephen R.H. Barrett, et al.,

*Impact of the Volkswagen emissions control defeat devices on US public health*, IOPScience (October 29, 2015)).

6. Plaintiffs are individuals that purchases or leased a Class Vehicle in the U.S. The Class Vehicles include the following:

| **2.0-liter Class Vehicles** | |
|---|---|
| Volkswagen Jetta TDI | 2009-2015 |
| Volkswagen Jetta SportWagen TDI | 2009-2014 |
| Volkswagen Beetle TDI | 2012-2015 |
| Volkswagen Beetle Convertible TDI | 2012-2015 |
| Audi A3 TDI | 2010-2015 |
| Volkswagen Golf TDI | 2010-2015 |
| Volkswagen Golf SportWagen TDI | 2015 |
| Volkswagen Passat TDI | 2012-2015 |

| **3.0-liter Class Vehicles** | |
|---|---|
| Volkswagen Touareg TDI | 2009-2016 |
| Porsche Cayenne Diesel | 2013-2016 |
| Audi A6 Quattro TDI | 2014-2016 |
| Audi A7 Quattro TDI | 2014-2016 |
| Audi A8 TDI | 2014-2016 |
| Audi A8L TDI | 2014-2016 |
| Audi Q5 TDI | 2014-2016 |
| Audi Q7 TDI | 2009-2016 |

7. Volkswagen induced plaintiffs to purchase or lease the Class Vehicles, which are illegal because they violate the CAA (among other laws) and, on top of that, admittedly do not perform as represented. No one would or could have purchased the Class Vehicles but for Volkswagen's fraudulent scheme, because Volkswagen obtained EPA COCs (and CARB EOs) only by cheating. In addition to now owning illegal, dirty diesels, plaintiffs have suffered economic damages due to the steep diminution in value of their Class Vehicles, which pollute the environment at levels far in excess of the legal limits, cannot pass required emissions tests, and are subject to a planned recall in the indefinite future (even though no complete fix has yet been announced). To the extent the Class Vehicles can be repaired or retrofitted to pass Federal and State emission requirements, they will, absent a full and comprehensive compensation program by defendants, continue to suffer in diminution in value and cause economic loss. This is so because any such repairs or retrofits will reduce mileage per gallon, increase costs of operation,

4

and cause the vehicles to suffer lower performance, durability, and reliability, reducing market value and increasing cost of ownership and operation.

8.    On behalf of themselves, the plaintiffs hereby bring this action for violations of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq.* ("RICO")); the Federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.* ("MMWA")); common law fraud, contract, warranty, unjust enrichment, and consumer protection laws of all 50 states and the District of Columbia.

9.    Plaintiffs seek a buy-back program for the Class Vehicles, monetary damages (including treble damages under RICO), appropriate restitution, pollution mitigation, business reforms, and injunctive and other equitable relief.  In addition, plaintiffs are entitled to a significant award of punitive or exemplary damages, given that, for years, Volkswagen deliberately, and with malice, deceived plaintiffs, disregarded their rights, and used them an unwitting puppets in a scheme that jeopardized the safety of the American public.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.  Subject matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961 et seq.  The Court has personal jurisdiction over defendants pursuant to 18 U.S.C. § 1965(b) and (d), and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

11.    The Court also has personal jurisdiction over the Volkswagen defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

12.    Venue is proper in the Central District of Illinois pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District, a substantial part of the property that is the subject of this action

is situated in this District, Class Members residing in this district have been harmed as a result of

defendants' acts or omissions, and defendants are subject to the Court's personal jurisdiction with

respect to this action.

## THE PARTIES

### A.     Plaintiffs

13.     For ease of reference, the following chart identifies and organizes the individual

Plaintiffs by the state in which they purchased or leased their Class Vehicles

| No. | Plaintiff | State | Model Year | Make | Model |
|-----|-----------|-------|-----------|------|-------|
| 1 | Harry Andrianos | IL | 2012 | Volkswagen | Jetta TDI |
| 2 | Bogdan Barwacz | IL | 2012 | Volkswagen | Passat TDI |
| 3 | Ovidiu Borz | IL | 2014 | Volkswagen | Jetta SportWagen TDI |
| 4 | Junko Bozenda | IL | 2014 | Volkswagen | Jetta TDI |
| 5 | Ricardo Briseno | IL | 2012 | Volkswagen | Passat TDI |
| 6 | Michele Catoline-Greenwall | IL | 2013 | Volkswagen | Jetta SportWagen TDI |
| 7 | Donald Cunningham | IL | 2015 | Volkswagen | Jetta TDI |
| 8 | Lu Fatlan | IL | 2010 | Volkswagen | Jetta TDI |
| 9 | Robert Faut | IL | 2010 | Volkswagen | Jetta TDI |
| 10 | Jon Gilles | IL | 2014 | Volkswagen | Jetta TDI |
| 11 | Michael Glass | IL | 2011 | Volkswagen | Jetta SportWagen TDI |
| 12 | Frank Gordon | IL | 2014 | Volkswagen | Jetta TDI |
| 13 | David Hagenbuch | IL | 2012 | Volkswagen | Passat TDI |
| 14 | Kyra Hicks | IL | 2010 | Volkswagen | Jetta TDI |
| 15 | Michael Jamiolkowski | IL | 2013 | Audi | A3 |
| 16 | Blake Klosa/Wendy Klosa | IL | 2014 | Volkswagen | Jetta TDI |
| 17 | Joshua Martin | IL | 2013 | Volkswagen | Jetta TDI |
| 18 | Robert Mugge | IL | 2014 | Volkswagen | Jetta SportWagen TDI |
| 19 | Brian Mullins | IL | 2015 | Volkswagen | Jetta TDI |
| 20 | Leann Niebuhr/Karl Niebuhr | IL | 2014 | Volkswagen | Jetta TDI |
|    |            |    | 2010 | Volkswagen | Jetta TDI |
|    |            |    | 2012 | Volkswagen | Golf TDI |
| 21 | Louis Pace | IL | 2014 | Volkswagen | Jetta SportWagen TDI |
| 22 | Herbert Patterson | IL | 2012 | Volkswagen | Passat TDI |
| 23 | David Prahl | IL | 2013 | Volkswagen | Jetta TDI |
| 24 | Gloria Resendiz | IL | 2013 | Volkswagen | Passat TDI |
| 25 | Darin Rose | IL | 2014 | Volkswagen | Jetta TDI |
| 26 | Tomas Savelskas/Gintare Savelskas | IL | 2013 | Volkswagen | Jetta SportWagen TDI |
|    |            |    | 2012 | Volkswagen | Jetta SportWagen TDI |
| 27 | David Sollis, Jr. | IL | 2010 | Volkswagen | Jetta TDI |
| 28 | Matthew Sztejkowski | IL | 2016 | Porsche | Cayenne |
| 29 | Grace Wagner | IL | 2012 | Volkswagen | Jetta SportWagen TDI |
| 30 | Glen Weber/Sandra Weber | IL | 2014 | Volkswagen | Touareg |
| 31 | Nels Mattson | MN | 2010 | Volkswagen | Jetta TDI |
| 32 | Ryan Angle-Graves | MO | 2009 | Volkswagen | Jetta TDI |
| 33 | Virginia Forrest | MO | 2014 | Volkswagen | Touareg |
| 34 | Corey Hloben/Lauren Hloben | MO | 2014 | Volkswagen | Jetta TDI |

| 35 | Jeff Viele | SD | 2010 | Volkswagen | Jetta TDI |
| 36 | James Cottral | WI | 2013 | Volkswagen | Passat TDI |

### 1.      Illinois Plaintiffs

14.      The plaintiff, HARRY ANDRIANOS, is a citizen of the State of Illinois.  The plaintiff purchased a 2012 Volkswagen Jetta TDI, VIN #3VWLL7AJ8CM465967 (hereinafter referred to as "Class Vehicle) on July 19, 2012 from Auto Barn in Countryside, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

15.      The plaintiff, BOGDAN BARWACZ, is a citizen of the State of Illinois.  The plaintiff purchased a 2012 Volkswagen Passat TDI (hereinafter referred to as "Class Vehicle).  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct

and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

16.    The plaintiff, OVIDIU BORZ, is a citizen of the State of Illinois.  The plaintiff purchased a 2014 Volkswagen Jetta SportWagen TDI, VIN #3VWPL7AJ6E19613179 (hereinafter referred to as "Class Vehicle) on May 1, 2014 from Liberty Auto Plaza in Libertyville, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

17.    The plaintiff, JUNKO BOZENDA, is a citizen of the State of Illinois.  The plaintiff purchased a 2014 Volkswagen Jetta Sedan TDI, VIN #3VWLL7AJ1EM418282 (hereinafter referred to as "Class Vehicle) on June 11, 2014 from Jennings Volkswagen in Glenview, IL. Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct

and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

18.    The plaintiff, RICARDO BRISENO, is a citizen of the State of Illinois.  The plaintiff purchased a 2012 Volkswagen Passat TDI, VIN #3VWRL7AJ4AM122788 (hereinafter referred to as "Class Vehicle) on August 19, 2013 from Fox Valley Volkswagen in Schaumburg, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.   The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

19.    The plaintiff, MICHELE CATOLINE-GREENWALL, is a citizen of the State of Illinois.    The plaintiff purchased a 2013 Volkswagen Jetta SportWagen TDI, VIN #3VWPL7AJ1DM633340 (hereinafter referred to as "Class Vehicle) on January 7, 2013 from Dickinson Dean Economy Cars, Inc. in Ballwin, MO.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has

suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

20.      The plaintiff, DONALD CUNNINGHAM, is a citizen of the State of Illinois.  The plaintiff purchased a 2015 Volkswagen Jetta TDI, VIN #3VWLA7AJXFM319192 (hereinafter referred to as "Class Vehicle) on April 18, 2015 from Bommarito Volkswagen in Hazelwood, IL. Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

21.      The plaintiff, LU FATLAN, is a citizen of the State of Illinois.  The plaintiff purchased a 2010 Volkswagen Jetta Sedan TDI, VIN #3VWRL7AJ2AM044947 (hereinafter referred to as "Class Vehicle) on March 6, 2010 from Sierra Motors in Ottawa, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants'

conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

22.     The plaintiff, ROBERT FAUT, is a citizen of the State of Illinois.  The plaintiff purchased a 2010 Volkswagen Jetta Sedan TDI, VIN #3VWAL7AJ8AM037837 (hereinafter referred to as "Class Vehicle) in October, 2009 from The Autobarn Volkswagen in Evanston, IL. Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

23.     The plaintiff, JON GILLES, is a citizen of the State of Illinois.  The plaintiff purchased a 2014 Volkswagen Jetta TDI, VIN #3VW3L7AJ1EM401269 (hereinafter referred to as "Class Vehicle) on May 16, 2014 from Autohaus of Peoria in Peoria, Illinois.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants'

conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

24.    The plaintiff, MICHAEL GLASS, is a citizen of the State of Illinois.  The plaintiff purchased a 2011 Volkswagen Jetta SportWagen TDI, VIN #3VWPL7AJXBM702507 (hereinafter referred to as "Class Vehicle) in June, 2011 from Jennings Volkswagen in Glenview, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

25.    The plaintiff, FRANK GORDON, is a citizen of the State of Illinois.  The plaintiff purchased a 2014 Volkswagen Jetta TDI, VIN #3VWLL7AJXEM223121 (hereinafter referred to as "Class Vehicle) in July, 2014 from Green Toyota Scion Audi Volkswagen in Springfield, IL. Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct

and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

26.     The plaintiff, DAVID HAGENBUCH, is a citizen of the State of Illinois.  The plaintiff purchased a 2012 Volkswagen Passat TDI, VIN #1VWCN7A37CC101259 (hereinafter referred to as "Class Vehicle) on June 19, 2012 from Sierra Motors in Ottawa, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

27.     The plaintiff, KYRA HICKS, is a citizen of the State of Florida.  The plaintiff purchased a 2010 Volkswagen Jetta TDI, VIN #3VWAL7AJ6AM159645 (hereinafter referred to as "Class Vehicle) on October 29, 2011 from Fletcher Jones Imports in Chicago, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct

and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

28.     The plaintiff, MICHAEL JAMIOLKOWSKI, is a citizen of the State of Illinois.  The plaintiff purchased a 2013 Audi A3, VIN #WAUKJAF3DA033447 (hereinafter referred to as "Class Vehicle) on October 31, 2013 from Continental Audi in Naperville, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

29.     The plaintiffs, BLAKE KLOSA and WENDY KLOSA, are citizens of the State of Illinois.  The plaintiffs purchased a 2014 Volkswagen Jetta TDI, VIN #3VWLL7AJ6EM290962 (hereinafter referred to as "Class Vehicle) on September 20, 2014 from Lou Bachrodt Volkswagen in Rockford, IL.  Before purchasing the Class Vehicle, plaintiffs saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiffs to purchase the Class Vehicle.  Unbeknownst to plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiffs have suffered concrete injury as

a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

30.     The plaintiff, JOSHUA MARTIN, is a citizen of the State of Illinois.  The plaintiff purchased a 2013 Volkswagen Jetta TDI, VIN #3VWLL7AJ4DM293213 (hereinafter referred to as "Class Vehicle) on September 5, 2013 from Sierra Motors in Ottawa, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

31.     The plaintiff, ROBERT MUGGE, is a citizen of the State of Illinois.  The plaintiff purchased a 2014 Volkswagen Jetta SportWagen TDI, VIN #3VWLL7AJ3EM386547 (hereinafter referred to as "Class Vehicle) on September 18, 2015 from Country Blacksmith Truck Sales in Johnsonville, IL.   Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a

15

direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

32.    The plaintiff, BRIAN MULLINS, is a citizen of the State of Illinois.  The plaintiff purchased a 2015 Volkswagen Jetta TDI, VIN #3VWLA7AJ5FM409947 (hereinafter referred to as "Class Vehicle) on August 22, 2015 from The Autobarn City Volkswagen.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

33.    The plaintiffs, LEANN NIEBUHR and KARL NIEBUHR, are citizens of the State of Illinois.  The plaintiffs purchased a 2014 Volkswagen Jetta TDI, VIN #3VW3L7AJ6EM376806 (hereinafter referred to as "Class Vehicle) on November 9, 2013 from Autohaus of Peoria in Peoria, Illinois, a 2010 Volkswagen Jetta TDI, VIN#3VWRL7AJAM027853 in October, 2009 from Green Toyota/Volkswagen in Springfield, IL, and a 2012 Volkswagen Golf TDI, VIN #WVWDM7AJ6CW027923 on August 22, 2011 from Autohaus of Peoria, in Peoria, IL.  Before purchasing the Class Vehicle, plaintiffs saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiffs to purchase the Class Vehicle. Unbeknownst to plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device

designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiffs have suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

34.      The plaintiff, LOUIS PACE, is a citizen of the State of Illinois.  The plaintiff purchased a 2014 Volkswagen Jetta SportWagen TDI (hereinafter referred to as "Class Vehicle). Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

35.      The plaintiff, HERBERT PATTERSON, is a citizen of the State of Illinois.  The plaintiff purchased a 2012 Volkswagen Jetta Passat TDI, VIN #1VWBN7A33CC020352 (hereinafter referred to as "Class Vehicle) on May 30, 2015 from a private owner.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently,

the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

36.     The plaintiff, DAVID PRAHL, is a citizen of the State of Illinois.  The plaintiff purchased a 2013 Volkswagen Jetta TDI, VIN #3VWLL7AJ5DM389061 (hereinafter referred to as "Class Vehicle) on August 17, 2015 from O'Brien Auto Park in Urbana, IL 61802.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.   The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

37.     The plaintiff, GLORIA RESENDIZ, is a citizen of the State of Illinois.  The plaintiff purchased a 2013 Volkswagen Passat TDI, VIN #1VWBN7A3XDC054953 (hereinafter referred to as "Class Vehicle) on June 29, 2013 from Autobarn of Countryside, Countryside, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.   The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently,

the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

38.    The plaintiff, DARIN ROSE, is a citizen of the State of Illinois.  The plaintiff purchased a 2014 Volkswagen Jetta TDI, VIN #3VWLL7AJGEM401929 (hereinafter referred to as "Class Vehicle) on May 24, 2014 from Volkswagen of Crystal Lake, Crystal Lake, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.   The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

39.    The plaintiffs, TOMAS SAVELSKAS and GINTARE SAVELSKAS, are citizens of the State of Illinois.  The plaintiffs purchased a 2013 Volkswagen Jetta SportWagen TDI, VIN #3VWPL7AJ4DM663612 (hereinafter referred to as "Class Vehicle) on August 27, 2014 from a private owner and purchased a 2012 Volkswagen Jetta TDI Sportwagen, VIN #3VWPL7AJ1CM677238 on December 21, 2013 from a private owner.  Before purchasing the Class Vehicle, plaintiffs saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiffs to purchase the Class Vehicle.  Unbeknownst to plaintiffs, at

the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiffs have suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

40.     The plaintiff, DAVID W. SOLLIS, JR., is a citizen of the State of Illinois.  The plaintiff purchased a 2010 Volkswagen Jetta TDI, VIN #3VWAL7AJ6AM052000 (hereinafter referred to as "Class Vehicle) in December, 2009 from Autobarn of Countryside in Countryside, IL  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

41.     The plaintiff, MATTHEW SZTEJKOWSKI, is a citizen of the State of Illinois.  The plaintiff purchased a 2016 Porsche Cayenne, VIN #WP1AF2A26GKA40238 (hereinafter referred to as "Class Vehicle) on August 4, 2015 from The Porsche Exchange in Highland Park, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.   The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.

Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

42.    The plaintiff, GRACE WAGNER, is a citizen of the State of Illinois.  The plaintiff purchased a 2012 Volkswagen Jetta SportWagen TDI, VIN #3VWPL7AJ7CM686297 (hereinafter referred to as "Class Vehicle) on May 15, 2012 from The Autobarn Volkswagen in Mt. Prospect, IL.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

43.    The plaintiffs, GLEN WEBER and SANDRA WEBER, are citizens of the State of Illinois.  The plaintiffs purchased a 2014 Volkswagen Touareg, VIN #WVGEP9BP0ED012726 (hereinafter referred to as "Class Vehicle) on August 25, 2014 from Auffenberg Volkswagen in O'Fallon, IL.  Before purchasing the Class Vehicle, plaintiffs saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiffs to purchase the

Class Vehicle. Unbeknownst to plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal. Plaintiffs have suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

### 2.    Minnesota Plaintiffs

44.    The plaintiff, NELS MATTSON, is a citizen of the State of Minnesota. The plaintiff purchased a 2010 Volkswagen Jetta TDI, VIN #3VWPL7AJ7AM646654 (hereinafter referred to as "Class Vehicle) on May 2, 2015 from Apple Auto in Apple Valley, MN. Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

### 3.    Missouri Plaintiffs

45.    The plaintiff, RYAN ANGLE-GRAVES, is a citizen of the State of Kansas. The plaintiff purchased a 2009 Volkswagen Jetta TDI, VIN #3VWRL71K09M153556 (hereinafter referred to as "Class Vehicle) on October 17, 2015 from Corwin Dodge in Springfield, MO. Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient. The emission representations, in

combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

46. The plaintiff, VIRGINIA FORREST, is a citizen of the State of Illinois. The plaintiff purchased a 2014 Volkswagen Touareg, VIN #WVGEP9BP3ED004541 (hereinafter referred to as "Class Vehicle) on September 20, 2014 from Dean Team Volkswagen in Kirkwood, Missouri. Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle. Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

47. The plaintiffs, COREY HLOBEN and LAUREN HLOBEN, are citizens of the State of Missouri. The plaintiffs purchased a 2014 Volkswagen Jetta TDI, VIN #3VWLL7AJ6EM316668 (hereinafter referred to as "Class Vehicle) in October, 2014 from Bommarito Volkswagen in St. Peters, Missouri. Before purchasing the Class Vehicle, plaintiffs saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient. The emission

representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiffs to purchase the Class Vehicle.  Unbeknownst to plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiffs have suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

### 4.      South Dakota Plaintiffs

48.      The plaintiff, JEFF VIELE, is a citizen of the State of Illinois.  The plaintiff purchased a 2010 Volkswagen Jetta TDI, VIN #3VWRL7AJ2AM126127 (hereinafter referred to as "Class Vehicle) on December 31, 2012 from Sioux Falls Ford in Sioux Falls, SD.  Before purchasing the Class Vehicle, plaintiff saw numerous ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

### 5.      Wisconsin Plaintiffs

49.      The plaintiff, JAMES COTTRAL, is a citizen of the State of Illinois.  The plaintiff purchased a 2013 Volkswagen Passat TDI, VIN #1VWBN7A36DC124755 (hereinafter referred to as "Class Vehicle) on June 30, 2013 from Zimbrick Volkswagen in Middleton, WI.  Before

24

purchasing the Class Vehicle, plaintiff saw numerous television ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced plaintiff to purchase the Class Vehicle.  Unbeknownst to plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle, could not deliver the advertised combination of low emissions, high performance, and fuel economy, and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of defendants' conduct, and would not have purchased the Class Vehicle had defendants not concealed the illegal defeat device.

**B.      Defendants**

**1.      Volkswagen AG**

50.      Volkswagen AG ("VW AG") is a German corporation with its principal place of business in Wolfsburg, Germany.  VW AG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles.  VW AG is the parent corporation of VW American, Audi AG, and Porsche AG.  According to VW AG, it sold 10.14 million cars worldwide in 2014, including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars, and 189,849 Porsche-branded cars.  Combined with other brands, VW AG boasts a 12.9% share of the worldwide passenger car market.  VW AG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion).   At €12.7 billion (approximately $13.9 billion), VW AG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

51.      VW AG engineered, designed, developed, manufactured, and installed the defeat device software on the Class Vehicles equipped with the 2.0-liter TDI® and exported these vehicles with the knowledge and understanding that they would be sold throughout the United

States.   VW AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Class Vehicles.

### 2.    Volkswagen Group of America, Inc.

52.    Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  VW America is a wholly-owned subsidiary of Volkswagen AG, and it engaged in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states.  In 2014 alone, VA America sold 552,729 vehicles from its 1,018 dealer locations in all 50 states, including 95,240 TDI® "clean" diesel vehicles.

### 3.    Audi AG

53.    Audi AG is a German Corporation with its principal place of business in Ingolstadt, Germany.  Audi AG is the parent of Audi of America, LLC and a subsidiary of the Audi Group, which is a wholly-owned subsidiary of VW AG.  Audi AG designs, develops, manufactures, and sells luxury automobiles.  According to Audi AG, the Audi Group sold 1.74 million cars worldwide in 2014, with sales revenues in 2014 totaling €53.8 billion (approximately $58.5 billion).  Audi AG's operating profit in fiscal year 2014 was €5.15 billion (approximately $5.63 billion).

54.    Audi AG engineered, designed, developed, manufactured and installed the defeat device software on the Class Vehicles equipped with the 3.0-liter TDI® diesel engine, and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States.   Audi AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell its Class Vehicles.

### 4.    Audi of America, LLC

55.    Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engaged in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

### 5.    Dr. Ing. h.c.F. Porsche AG

56.    Dr. Ing. h.c.F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany.  Porsche AG designs, develops, manufactures, and sells luxury automobiles.  Porsche AG is a wholly-owned subsidiary of VW AG.  According to Porsche AG, it sold 187,208 cars worldwide in 2014, with sales revenues in 2014 totaling €17.2 billion (approximately $18.8 billion).  Porsche AG's operating profit in fiscal year 2014 was €2.79 billion ($2.97 billion).

57.    Porsche AG installed the defeat device software on the Class Vehicles equipped with the 3.0-liter TDI® diesel engine, and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States.  Porsche AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell its Class Vehicles.

### 6.    Porsche Cars North America, Inc.

58.    Porsche Cars North America, Inc. ("Porsche America") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, GA 30354.  Porsche America is a wholly-owned U.S. subsidiary of Porsche AG, and it engages in business, including the advertising, marketing and sale of Porsche automobiles, in all 50 states.  According to Porsche AG, 2014 represented its best annual results in Porsche history in the U.S., with 47,007 automobiles delivered.  Porsche America now maintains a network of 189 dealers nationwide.

### 7.    Martin Winterkorn

59.    Martin Winterkorn ("Winterkorn") is a resident of Germany.  Winterkorn was CEO of VW AG until he resigned on September 23, 2015, in the wake of the diesel emissions scandal. Notably, Winterkorn was widely regarded as a detail-oriented, micromanaging CEO, who retained control over engineering details that many other CEOs would relinquish fully to deputies. Winterkorn is being investigated by the German government for allegations of fraud.  Winterkorn reportedly hand-picked the engineers who designed the defeat devices.  Winterkorn received

compensation from the illegal scheme and course of conduct based on the revenues and profits from the Class Vehicles, and Volkswagen's increased market share. Winterkorn approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Winterkorn is subject to the personal jurisdiction of this Court as he has availed himself of the laws of the United States through his management and control over VA America as well as the manufacture, distribution, testing, and sale of hundreds of thousands of Class Vehicles imported and sold across the United States. Furthermore, Winterkorn has consistently travelled to the U.S. to attend and make presentations at various car shows across the country in order to promote the sale of the Class Vehicles.

### 8.    Matthias Müller

60.    Matthias Müller ("Müeller") is a resident of Germany. Müller is a 40-year veteran of Volkswagen, where he began as an apprentice toolmaker at Audi AG in 1977. Müller was appointed coordinator of the Audi model lines in 2002, after Winterkorn took over the management of Audi AG. In 2007, when Winterkorn became CEO of VW AG, Winterkorn appointed Müller has Head of Product Management across all Volkswagen brands. In 2010, Müller was appointed CEO of Porsche AG. In 2014, Müller became the Chief Information Office of Porsche Automobil Holding SE. Müller became the CEO of VW AG on September 25, 2015, upon Winterkorn's resignation amidst the emissions scandal. Müller profited millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the Class Vehicles and Volkswagen's increased market share. Müller approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Müller is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control of the American Volkswagen defendants, as well as the design, manufacture, distribution, testing, and/or sale of hundreds of thousands of Class Vehicles imported and sold across the United States. Furthermore, Müller has consistently travelled to the U.S. to attend and

make presentations at various car shows across the country in order to promise the sale of the Class Vehicles.

### 9. Michael Horn

61.    Michael Horn ("Horn") is a resident of Virginia.  Horn is President and CEO of VW America.  Horn received compensation from the illegal scheme and course of conduct based on the revenues and profits from the Class Vehicles, and Volkswagen's increased market share. Horn approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Horn has admitted that he was aware of the vehicles' emissions non-compliance since at least 2014.

### 10. Rupert Stadler

62.    Rupert Stadler ("Stadler") is a resident of Germany.  Stadler became the CEO of Audi AG on January 1, 2010.  Stadler joined Audi AG in 1990 and has held various roles at Audi and VW, including the Head of the Board of Management's Office for Volkswagen and the Head of Group Product Planning.  In 2003, Stadler became an Audi AG Board Member and was later being responsible for the Finance and Organization Division.   Stadler joined the Board of Management of Volkswagen when he was appointed to his current role as CEO of Audi AG. Stadler received millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the Class Vehicles and Volkswagen's increased market share.  Stadler approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Stadler is subject to personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control over Audi America as well as the design, manufacture, distribution, testing, and/or sale of hundreds of thousands of Class Vehicles imported and sold across the United States.  Furthermore, Stadler has consistently travelled to the U.S. to attend and make presentations at various car shows across the country in order to promote the sale of the Class Vehicles.

### 11. Robert Bosch GmbH

63.    Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Robert Bosch GmbH is the parent company of Robert Bosch LLC.  Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to Volkswagen for use in the Class Vehicles.

### 12.    Robert Bosch, LLC

64.    Robert Bosch LLC is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.  Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH.  Robert Bosch LLC directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat device to Volkswagen for use in the Class Vehicles.

### 13.    Volkmar Denner

65.    Volkmar Denner ("Denner") is a resident of Germany.  Denner has been the Chairman CEO of Robert Bosch GmbH since July 1, 2012.  Denner contemporaneously holds the position of Chief Technology Officer.  Denner joined Bosch in 1986, and has held numerous positions within the company, including Director of ECU Development, Vice-President of Sales and Development, Semiconductors and Electronic Control Units division, and President of Automotive Electronics division.  In 2006, Denner became a member of Robert Bosch GmbH's Board of Management and was later responsible for research and advance engineering, product planning, and technology coordination across the company's three business sectors from July, 2010 until his appointment as CEO.  Denner received millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the sale of defeat devices to Volkswagen.  Denner approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Denner is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control over Robert

Bosch, LLC as well as the design, manufacture, distribution, testing, and/or sale of hundreds of thousands of elements of the defeat devices installed in the Class Vehicles.

## IV.     COMMON FACTUAL ALLEGATIONS

### A.     Volkswagen's Plot to Dominate the Automotive Market

66.     Volkswagen's illegal scheme was born out of greed and ambition to dominate the global automotive market at any cost.  By Volkswagen's own admissions, the seeds for the scandal were planted in 2005, as Volkswagen was repositioning its fleet in light of tightening emission regulations in our country with "a strategic decision to launch a large-scale promotion of diesel vehicles in the United States in 2005.  (See *Volkswagen making good progress with its investigations, technical solutions, and Group realignment*, Volkswagen AG (Dec. 10, 2015)).  While other automakers focused on hybrid or hydrogen-fueled vehicles, Volkswagen pivoted toward "clean" diesel technology as its primary strategy to reach the growing market of environmentally-conscious consumers.

67.     In 2004, the second generation Toyota Prius became an explosive success, tripling global sales from years prior and changing environmentally-friendly vehicles from a niche market to a standard consumer option.  Although it was the first mainstream hybrid vehicle, the Prius was widely viewed as a "boring" vehicle, as the improvements in fuel efficiency and emissions were offset by relatively bland styling and lackluster driving performance.

68.     Volkswagen took note of the success and sought to achieve the same (or better) efficiency benchmarks as the Prius, but in a "fun-to-drive," high-performance vehicle.  This was to be achieved with a supposedly remarkable breakthrough in diesel technology:  the EA 189 TDI engine.  Volkswagen's TDI (short for "turbocharged direct injection"), diesel engines were the culmination of millions of dollars in research and development, and were heralded as the critical factor that would be responsible for Volkswagen's growth and success in the U.S.

69.     In 2007, defendant Winterkorn left his position at Audi to become VW AG's CEO.  Winterkorn set goals for Volkswagen to become a world leader in automobile manufacturing.  This

included a target of tripling U.S. sales to at least 800,000 vehicles by 2018. (See William Boston, *Volkswagen Emissions Investigation Zeroes in on Two Engineers*, Wall Street Journal (Oct. 2015)). At the time, diesel-engine vehicles made up just 5% of the U.S. car market, and Winterkorn recognized this as the perfect opportunity to expand Volkswagen's market share. As shown below in a VW America presentation touting the success of "clean diesel," this strategy was employed with great success:



(See *Volkswagen AG, TDI:  U.S. Market Success*, Clean Diesel Delivers (March, 2015)).

70.    To expand its diesel market penetration in the U.S., Volkswagen needed to overcome the stigmas associated with diesel vehicles. Foremost among these was the consumer perception that diesel engines emit thick, toxic smoke full of dangerous and destructive pollutants, relegated to the smog-filled cities of the past. Volkswagen claimed to have solved all of these environmental problems with the new EA 189 engine, which it aggressively marketed as the clean, green alternative to hybrid engines, such as those in the Prius.

71.    Behind the scenes, however, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and

engineering constraints.  To get the job done, Winterkorn appointed two engineers with whom he had worked closely at Audi (Ulrich Hackenberg and Wolfgang Hatz) to head up R&D and engine development for this project.  These two engineers were the chief developers of the TDI engine. (See Jack Ewing, *Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008*, N.Y. Times (Oct. 5, 2015)). Their primary mandate from management was to develop a diesel engine that maintained the performance of traditional gasoline engines with reduced $CO_2$ emissions and fuel consumption, all while meeting the strict $NO_x$ emission standards in the U.S.  Winterkorn also relied upon and worked closely with Frank Tuch, VW's head of quality assurance, who was intimately familiar with the engines and transmissions across all Volkswagen brands.

72.     $NO_x$ is a generic term for the mono-nitrogen oxides NO and $NO_2$ (nitric oxide and nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen gases in the air during combustion.  $NO_x$ is produced by the burning of all fossil fuels, but is particularly difficult to control from the burning of diesel fuel.  $NO_x$ is a toxic pollutant, which produces smog and a litany of environmental and health problems, as detailed further below.

73.     Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains longer hydrocarbon chains, which tends to produce a more efficient vehicle.  In fact, diesel engines can convert over 45% of diesel's chemical energy into useful mechanical energy, whereas gasoline engines convert only 30% of gasoline's chemical energy into mechanical energy.  (See *Just the Basics, Diesel Engine*, U.S. Dept. of Energy, Office of Energy Efficiency and Renewable Energy)). To make use of this dense diesel fuel, diesel engines combine high pressure to ignite a combination of diesel fuel and air through "compression ignition," as opposed gasoline engines that typically use electric discharge from a spark plug to ignite a combination of gasoline and air through "spark ignition."   Though more efficient, diesel engines come with their own set of challenges, as emissions from diesel engines can include higher levels of $NO_x$ and particulate matter ("PM"), or soot than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion.

33

One way $NO_x$ emissions can be reduced by adjusting the compression and temperature, but that in turn produces PM, a similarly-undesirable hydrocarbon-based emission.  Another way $NO_x$ emissions can be reduced is through expensive exhaust gas after-treatment devices, primarily, catalytic converters, that use a series of chemical reactions to transform the chemical composition of a vehicle's $NO_x$ emissions into less harmful, relatively inert, and triple bonded nitrogen gas ($N_2$) (just over 78% of the Earth's atmosphere by volume consists of $N_2$) and carbon dioxide ($CO_2$).

74.     Diesel engines thus operate according to this trade-off between price, $NO_x$ and PM, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce both low PM and low $NO_x$.  In 2000, the EPA announced stricter emission standards requiring all diesel models starting in 2007 to produce drastically less $NO_x$ than years prior.

75.     These strict emission standards posed a serious challenge to Volkswagen's engineers.  In fact, during a 2007 demonstration in San Francisco, engine R&D chief Hatz lamented presciently that "[Volkswagen] can do quite a bit and we will do a bit, but 'impossible' we cannot do. . . . From my point of view, the CARB is not realistic . . . I see it as nearly impossible for [Volkswagen]."  (See Danny Hakim, *et al., VW Executive Had a Pivotal Role as Car Maker Struggled With Emissions*, N.Y. Times (Dec. 21, 2015)).

76.     But it was of utmost importance for Volkswagen to achieve (or at least appear to achieve) this "impossible" goal, for it could not legally sell a single vehicle that failed to comply with the governmental emission regulations.  Before introducing a Class Vehicle into the U.S. stream of commerce (or causing the same), Volkswagen was required to first apply for, and obtain, an EPA-administered COC, certifying that the vehicle comported with the emission standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10. The CAA expressly prohibits automakers, like Volkswagen, from introducing a new vehicle into the stream of commerce without a valid EPA COC.  See 42 U.S.C. § 7522(a)(1).  Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC.  See C.F.R. §§ 86.1848-10(c)(6).  California's emission

34

standards were even more stringent than those of the EPA.  California's regulator, CARB, requires a similar application from automakers to obtain an EO, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

77.    This, in order to successfully grow the U.S. diesel market and meet its ambitious objectives, it was critical that Volkswagen develop the technology to maintain the efficient, powerful performance of a diesel, while drastically reducing $NO_x$ emissions to comply with the CAA and state emission standards.

78.    This high-stakes engineering dilemma led to a deep divide within the company, as two divergent exhaust gas after-treatment technical approaches emerged.   One approach involved a selective catalytic reduction ("SCR") system that proved to be effective but expensive.  The other, which utilized a lean $NO_x$ trap, was significantly cheaper but was less effective and resulted in lower fuel efficiency.

79.    In 2006, Wolfgang Bernhard, then a top executive at VW AG (and former Daimler executive), advocated for the SCR system and championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop a SCR emission control system utilizing area – a post-combustion emission reductant generically referred to as "Diesel Exhaust Fluid" or "DEF" and marketed as "Bluetec" by Mercedes and "AdBlue" by Volkswagen and other German vehicle manufacturers that, when injected into the exhaust stream in a catalyst chamber, converts $NO_x$ into nitrogen gas, water, and carbon dioxide.  This SCR system was expensive, costing $350.00 per vehicle and came with other compromises, including primarily, the need for installation of a DEF tank that would require regular refills.

80.    Hatz initially supported this solution as well, stating publicly at the Detroit Auto Show in early 2007 that "Bluetec technology allows us to demonstrate Audi's commitment to always being at the very forefront of diesel technology."  *Id.*  He withdrew his support, however, as Volkswagen's leadership balked at the $350.00 per vehicle cost of the SCR system.  Bernhard ultimately lost the internal battle at Volkswagen and resigned.

81.    Hatz remained and was tasked with implementing the alternative, lower-cost strategy: $NO_x$ traps.  This technology involved the storage of $NO_x$ emissions in a catalyst substrate during vehicle operation.  Once that substrate filled up, the system burned off the stored $NO_x$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then converts the $NO_x$ into less harmful emissions.  This method was cheaper and easier to implement than the SCR system.  The $NO_x$ trap system was less effective at reducing emissions, however, and resulted in lower miles-per-gallon fuel efficiency, directly contradicting one of the key elements (high miles-per-gallon fuel efficiency) necessary to execute Volkswagen's ambitious diesel sales goals.  Accordingly, this option, too, was unacceptable.

82.    But at Volkswagen, failure was not an option.  According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's top brass directed its engineers to find a way to meet emission standards despite tight budgetary and technical constraints, or suffer the consequences.  VW AG's former CEO, Ferdinand Piëch, created "a culture where performance was driven by fear and intimidation," and his leadership was characterized as "a reign of terror."  (See Bob Lutz, *One Man Established the Culture That Led to VW's Emissions Scandal*, Road & Track (Nov. 4, 2015)).  Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail.  Do it, or I'll find somebody who will."  *Id.*  Piëch was infamous for firing subordinates who failed to meet his exacting standards:  "Stories are legion in the industry about Volkswagen engineers and executives shaking in their boots prior to presentations before Piëch, knowing that, if he was displeased, they might be fired instantly." (See Doron Levin, *The man who created VW's toxic culture still looms large*, Fortune (Oct. 16, 2015)).  And so it seems, out of self-preservation, the defeat device scandal was born.

B.    Defendants' "Defeat Device" Scheme

83.    Volkswagen engineers had to find a solution to the "impossible" problem of passing stricter emission standards while maintaining performance and fuel efficiency, all while hamstrung

by cost-cutting measures.  And it had to be done fast, because the new diesel vehicles were scheduled for imminent release in the U.S.

84.    Ultimately, time ran out, and Volkswagen executives and engineers were either unable or unwilling to devise a solution within the constraints of the law and their self-imposed cost-cutting measures.  So instead of being honest (and risk being summarily fired), they and others conspired to cheat by installing a "defeat device" in the new diesel vehicles so that those vehicles could "pass" the EPA and CARB emission testing, and Volkswagen could obtain COCs and EOs to sell the vehicles to make its sales targets throughout the U.S. and in California.

85.    It became clear that the TDI engine could not meet U.S. emission regulations when the launch of the Jetta TDI "clean" diesel, initially scheduled for 2007, had to be delayed after initial emission testing failed.  (See *VW delays Jetta TDI diesel into the U.S.*, Clean MPG).  The prospect of failure was unacceptable, so Volkswagen decided to cheat instead.  It has been reported that the decision to cheat the EPA, CARB, and countless other regulators worldwide was an "open secret" in Volkswagen's engine development department (See Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016)), as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted."  (See Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015)).

86.    All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC").  Bosch tested, manufactured and sold the EDC system used by Volkswagen in the Class Vehicles.  This system is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").  Upon its introduction, EDC  Unit 17 was publically touted by Bosch as follows:

> ". . . EDC17 . . . controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle

segment on all the world's markets.  In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides.  The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits."  (See February 28, 2006 Bosch press release, "The brain of diesel injection:  New Bosch EDC17 engine management system.")

87.    EDC Unit 17 was widely used throughout the automotive industry, including by BMW and Mercedes, to operate modern clean diesel engines.  Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code to manage the vehicle's engine operation.

88.    With respect to the Class Vehicles, however, EDC Unit 17 was also used and enabled by Bosch and Volkswagen to surreptitiously evade emissions regulations.  Bosch and Volkswagen worked together to develop and implement a specific set of software algorithms for implementation in the Class Vehicles, which enabled Volkswagen to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).  (See, e.g., *Engine management*, Bosch Auto Parts).  When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations.  Bosch's EDC Unit 17 gave Volkswagen the power to detect test scenarios by monitoring the vehicle speed, acceleration, engine operation, air pressure and even the position of the steering wheel.  When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels.  Once the EDC Unit 17 detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently, caused the car to spew the full amount of illegal

NO$_x$ emissions out on the road.  (See Russell Hotten, *Volkswagen:  The scandal explained*, BBC

(Dec. 10, 2015)).  This process is illustrated in the following diagram:



89.    Make no mistake; this workaround was highly illegal.  The CAA expressly prohibits

"defeat devices," defined as any auxiliary emission control device "that reduces the effectiveness

of the emission control system under conditions which may reasonably be expected to be

encountered in normal vehicle operation and use."  40 C.F.R. § 86.1803.01; 40 C.F.R. § 86.1809-

10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete

heavy-duty vehicle shall be equipped with a defeat device.").  Moreover, the CAA prohibits the

sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

90.    Thus, in order to obtain the COC's necessary to sell their vehicles, Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and performance altering software code within the EDC Unit 17 from government regulators, thus making that software an illegal "defeat device."   In other words, Volkswagen lied to the government, its customers, and the public at large.  An example of one of Volkswagen's vehicle stickers reflecting its fraudulently-obtained COCs is pictured below:



91.    Because the COCs were fraudulently-obtained, and because the Class Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Class Vehicles were never covered by a valid COC, and thus, were never legal for sale, nor were they EPA and/or CARB compliant, as represented.  Volkswagen hid these facts from the

EPA, other regulators, and consumers, and it continued to sell and lease the Class Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

92.    Volkswagen's illegal workaround was enabled by its close partnership with defendant Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in Volkswagen's diesel vehicles (approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world; see *Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016)).  Bosch was well aware that Volkswagen was using its emissions control components as a defeat device and, in fact, worked with Volkswagen to develop the software algorithm specifically tailored for the Class Vehicles.  Although Bosch reportedly "advised" Volkswagen as early as 2007 that the components should only be used for internal testing, not for manipulation of the engine in emission testing (see *VW scandal: Company warned over test cheating years ago*, BBC (Sept. 27, 2015)), it knew (or certainly should have known) that its lip service would be ignored, and that the components would be used as defeat devices. Bosch supplied Volkswagen with approximately 11 million such emission control components over seven years.

93.    Volkswagen, likewise, knew better—VW America itself is a recidivist violator of the CAA.  In July of 1973, the EPA sought legal action against VW America from the DOJ based on a claim that defeat devices were installed in 1973 Volkswagen vehicles.  The matter was swiftly settled for $120,000 the following year (see Rich Gardellsa, et al., *VW had previous run-in over 'defeat devices'*, NBC News (Sept. 23, 2015)).  And, in June of 2005, VW America entered into a consent decree with the DOJ, wherein it paid a $1.1 million penalty for failing to notify the EPA of emissions problems in certain vehicles manufactured by VW in Mexico (see Consent Decree, *United States v. Volkswagen of Am., Inc.*, Case No. 1:05-cv-01193-GK (D.D.C. June 15, 2015 and Nov. 4, 2005)).

94.    What's past is prologue, and Volkswagen could not help but repeat its cheating ways.  With respect to the Class Vehicles, Volkswagen hid the fact of the defeat devices from the EPA, such that the COCs were fraudulently obtained.  Specifically, VW America submitted COC applications on behalf of VW AG, Audi AG, and itself, for the 2.0-liter and VW- and Audi-branded 3.0-liter Class Vehicles, describing compliant specifications and concealing the dual-calibration strategy of the defeat device.  Similarly, Porsche America submitted COC applications on behalf of Porsche AG and itself for the Porsche-branded 3.0-liter Class Vehicles, describing compliant specifications and concealing the dual-calibration strategy of the defeat device.  But, the Class Vehicles differed in "material respects" from the specifications described in the COC applications because they were equipped with undisclosed auxiliary emissions control devices, specifically, the software code described above, that improperly functioned as a banned "defeat device."

95.    Because the COCs were fraudulently obtained, the Class Vehicles were never covered by valid COCs, and thus, were never offered legally for sale.  Volkswagen hid these facts from the EPA, CARB and other state regulators, and consumers, and it continued to sell and lease the Class Vehicles to the public, despite their illegality, and with the complicity of Bosch.

**C.    Volkswagen's "Clean" Diesel Advertising Campaign**

96.    While secretly using defeat devices to bypass emission testing, Volkswagen publicly declared a landmark victory—touting that it had successfully optimized its engines to maintain legal emissions, while simultaneously enjoying the cost savings and convenience factors of a lean NOX trap system.  Volkswagen claimed it accomplished this by monitoring and adjusting combustion conditions and using a two-stage exhaust gas recirculation system to reduce initial emissions, while neutralizing the remaining ones with a lean NOX trap to comply with U.S. law.  (See Hadler, et al., *Volkswagen's New 2.0l TDI Engine Fulfils the Most Stringent Emission Standards*, Internationales Wiener Motorensymposium 2008; see also *Self Study Program 826803: 2.0 Liter TDI Common Rail BinS ULEV Engine*, Volkswagen of America, Inc. (2008)).

42

Volkswagen branded and advertised this purportedly revolutionary technology to American consumers as "CleanDiesel" TDI technology.

97.     As we now know, Volkswagen's "clean" diesel campaign was built upon a lie. Indeed, the Class Vehicles were so "dirty" that they could not pass the minimum emission standards in the U.S., and Volkswagen had to lie to the EPA in order to sell them in the U.S.  But, of course, Volkswagen marketed and sold these Class Vehicles without ever disclosing to consumers that they were unlawful to sell or drive due to their high levels of $NO_x$ emissions.

### 1.     VW's False and Misleading Advertisements

98.     VW's "clean" diesel campaign was its key selling point for consumers increasingly concerned about the environment.  Its marketing mission was to "get clean-diesel power the recognition it deserves as a true 'green' technology," thereby growing Volkswagen's market share to match Winterkorn's lofty goals.  (See e.g., TDI Clean Diesel, http://www.venturavw.com/TDI-clean-diesel.html).  The objective was to change the way consumers thought of diesel technology, by replacing the mental image of sulfur emissions amid clouds of thick soot with that of heightened efficiency and reduced CO2 emissions.  In fact, the VW website stated:  This ain't your daddy's diesel.  Stinky, smoky, and sluggish.  Those old diesel realities no longer apply.  Enter TDI "clean" diesel.  Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."  (See Bill Chappell, *'It Was Installed For This Purpose,' VW's U.S. CEO Tells Congress About Defeat Device*, NPR (Oct. 8, 2015).

99.     Dubbing these diesel engines as "CleanDiesel" was a symptom of the brazen arrogance underlying the fraud.  VW's entire marketing campaign, from the branding of the products to the advertisements, focused on convincing consumers that the Class Vehicles were not merely compliant with emission regulations, but that they exceeded them.  This deception culminated in a Guinness World Record attempt in a 2013 Volkswagen Passat TDI, which ironically won an award for "lowest fuel consumption—48 U.S. states for a non-hybrid car."  (See

Nick Palermo, *Volkswagen Passat TDI Sets World Record for Fuel Economy*, Autotrader (July, 2013)).

100.    VW professed that its diesel-based technology was equal or superior to hybrid and electric options offered by its competitors.  As described by Mark Barnes (COO of VW America) when asked, "What is the advantage of a diesel over a hybrid?"

> "It's a fantastic power train. It gives very good fuel economy. It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, a very very clean running engine. Clean enough to be certified in all 50 states. It's just like driving a high-powered gasoline engine so you are not giving up one bit of the driving experience that you'd expect from a regular gasoline engine."  (See Gayathri Vaidyanathan, *Volkswagen: Our Diesel Cars Whup The Prius and Other Hybrids*, Business Insider (Oct. 9, 2009)).

101.    Facing skepticism, Barnes had a ready, if imaginative, response to the question, "How do you re-brand something that's dirty like diesel as something that's green?"

> "The way we've gone about it is through a number of communication pieces. One of them we've used is TDI Truth & Dare. It is a very good website that compares some older diesels versus the current TDI clean diesel. And one of the things we do is we put coffee filters over the exhaust pipes of both cars. We let them run for five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a round sooty spot on that coffee filter. Ours is very clean. In fact they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it."  *Id.*

102.    VW also advertised that its vehicles performed better on the road than in test conditions, touting in a 2008 press release: "While the Environmental Protection Agency estimates the Jetta TDI at an economical 29 mpg city and 40 mpg highway, Volkswagen went a step further to show real world fuel economy of the Jetta TDI.  Leading third-party certifier, AMCI, tested the Jetta TDI and found it performed 24 percent better in real world conditions, achieving 38 mpg in the city and 44 mpg on the highway."  (See Jake Fisher, *Did Volkswagen Use 'Cheat Mode' as a Selling Point?,* Consumer Reports (Oct. 19, 2015)).  This discrepancy between the EPA certified mpg figures (which are reverse calculated based on vehicle performance on a dynamometer) and the real world mpg figures came about because, in real world driving,

Volkswagen's defeat device *disabled* the full functioning of the NOX trap system exhaust gas after treatment control (which needed to burn more fuel to work properly), thereby decreasing vehicle operating costs at the expense of massively increased NOX emissions.

103.    Volkswagen distinguished the TDI "clean" diesel engines from other, "stinky, smoky, sluggish" diesels, proclaiming its "eco-conscious" status and of course failing to disclose that the Class Vehicles were "dirty" themselves.    These messages were prevalent in Volkswagen's extensive marketing campaign.

104.    Some advertisements, for example, specifically emphasized the low emissions and eco-friendliness of the vehicles:



105.    Others touted the combination of fuel efficiency and power:



**Volkswagen Turbo Diesel Injection.**
Less fuel consumption with added engine power.







Combining legendary performance and fuel economy, the TDI Clean Diesel is our least thirsty engine yet, delivering up to 1,235 kilometres (highway) per tank on models like the Touareg and Passat.

Come test drive one today.



106.    Yet others addressed the full package, implying that in contrast to the "stinky, smoky, and sluggish" diesel vehicles of old, Volkswagen's new diesel vehicles were clean, efficient, and powerful all at once:





107.    In addition, VW directed consumers to the www.clearlybetterdiesel.org website, which partnered with affiliates Audi and Porsche, as well as Bosch, Mercedes and BMW.  This website touted the benefits of newly developed diesel technology as "clean" and environmentally friendly.  Although it has been scrubbed of all content, the website previously contained false and misleading statements, such as:



108.    The website also offered a graphic slider, specifically representing that "clean" diesel produced less emissions and dramatically reduced smog, as shown by the following:



109.    This website may have accurately portrayed the environmental advantages of BMW diesel vehicles, which have not been implicated in the defeat device scandals, to date. However, Volkswagen's partnership with www.clearlybetterdiesel.org" falsely or misleadingly portrayed the Class Vehicles as an environmentally friendly, low emissions choice for discerning and socially responsible consumers.

110.    VW also produced a series of TV advertisements for the U.S. market, intended to debunk myths about diesel engines.  One ad, titled "Three Old Wives Talk Dirty," featured three elderly women debating whether diesels, though "beautiful," are dirty vehicles:



111.    To ostensibly debunk the "Old Wives' Tale" that diesel produced dirty exhaust and hazardous emissions, one of the women held her white scarf to the exhaust to convince the passengers that the exhaust was environmentally friendly, and not, in fact, dirty:



112.    She removed the scar, gestured at it, and asked her friends, "see how clean it is?"



113.    Like others in VW's "clean" diesel campaign, this ad falsely or misleadingly portrayed the exhaust emissions from the Class Vehicles as clean and safe.  In reality, the Class Vehicles actually emitted invisible and extremely hazardous levels of NOX.

114.    These themes extended to print brochures at dealerships and to VW's website. The brochures emphasized that VW's "clean" diesel was "clean," "green," and low emission.  For example, a "2012 Volkswagen Family" brochure for all VW models, states:

> "Let TDI "clean" diesel set you free from the filling station. Our TDI engines achieve astonishing mileage and range—up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. ***That's all thanks to the TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.*** On most models, you can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level."  (See Brochure: 2012 Volkswagen Family) (Emphasis added).

115.    Similarly, a "2013 Volkswagen Family" brochure, applicable to all models, states:

> "When you've had your fill of filling stations, hit the road in your TDI "clean" diesel Volkswagen. These engines achieve astonishing mileage and range-up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance.  ***That's all thanks to the TDI technology that uses a direct injection system, and runs on ultra-low-sulfur diesel, helping reduce emissions by up to 90% compared to previous diesels.*** Far and away, it's our best diesel yet."  (See Brochure: 2013 Volkswagen Family) (Emphasis added).

116.    And a 2012 "Volkswagen TDI "clean" diesel" brochure for the six models of Volkswagen TDIs then on the market (Jetta, Jetta SportWagen, Golf, Passat, Beetle, and Touareg) states:

> **"These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler.** Clean diesel vehicles meet the strictest EPA standards in the U.S. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.
>
> * * *
>
> **Think beyond green.** TDI represents one part of the Volkswagen.  Think Blue initiative, our goal of creating and encouraging eco-conscious products and behaviors. Join us in being more responsible on the road and on the planet."  (See Brochure:  2012 Volkswagen TDI® Clean Diesel).

117.    Further, a 2010 TDI Jetta and Jetta SportWagen brochure states:

> "The 2.0L TDI® "clean" diesel engine gives you 140hp and 236 lbs- ft of torque.This engine is the toast of Europe for its quickness, low emissions, and fuel efficiency—a staggering 38 city/44 highway mpg (automatic) based on real-world AMCI-certified testing (30 city/42 highway mpg. EPA estimates).
>
> * * *

Jetta TDI "clean" diesel offers fuel efficiency, power, performance, and a $1,300 tax credit from Uncle Sam because it qualifies as an Advanced Lean Burn Credit. ***Or, in other words, lean, mean, cleaner burning machines. Volkswagen believes in delivering a no-compromise German-tuned auto that performs, and still leaves a small carbon footprint. The Volkswagen TDI engine is cleaner than conventional diesels, emitting as much as 95% less soot than previous diesel engines, as well as a reduction in oxides of nitrogen and sulfur.*** It's powerful, with the kind of low-end torque that racers and tuners demand. It's efficient, using a turbocharger and smart exhaust design to burn fuel more effectively. So much so, in fact, that Volkswagen was the first automaker to make clean diesel cars certified in all 50 states. And best of all, it will help save you money with an out-of-this-world AMCI-estimated mileage of 38 city/44 highway mpg (automatic) and over 594 miles on a single tank of fuel.

* * *

There's even a Jetta SportWagen TDI "clean" diesel, with the same astonishing clean diesel technology, plus a whopping 66.9 cubic feet of Cargo room." (See Brochure: 2010 Volkswagen Jetta and Jetta SportWagen) (Emphasis added).

118.   And a Volkswagen 2011 Golf TDI brochure states:

"Regardless of which Golf model you get, you'll be seeing a lot fewer gas stations and a lot more road. The 2.5L Golf comes standard with a 170-hp, in-line five-cylinder engine with 177 lbs/ft torque and impressive fuel efficiency rated at 23 city/30 highway mpg. Opt for the Golf TDI model and you'll enjoy a turbocharged clean diesel engine with 140 hp and 236 lbs/ft of torque that will run you even farther at a whopping 30 city/42 highway mpg. That's up to 609 miles per tank. ***And you'll do it all with 95 percent fewer sooty emissions than diesel engines of old, making it cleaner for both you and the planet.*** So whether you're in the market for IntelliChoice's 2010 "Best Overall Value Compact Car over $17,000," or you want to go for a variation on that theme and get the ever-popular TDI model, you can't go wrong. In fact, you can go very right for a long, long time." (See Brochure: 2011 Volkswagen Golf).

119.   A Volkswagen 2012 Passat TDI brochure states:

"Let the Passat TDI "clean" diesel set you free from the filling station. It achieves an astonishing 43 highway mpg and travels 795 miles on a single tank without sacrificing one bit of turbocharged performance. ***That's all thanks to its TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel,       helping reduce sooty emissions by up to 90% compared to previous diesel engines.*** You can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.

* * *

The TDI "clean" diesel engine was designed and engineered around one simple belief: driving is more fun than refueling. ***So besides the reduced emissions and torque-filled benefits you experience behind the wheel of the Passat TDI, it***

*also saves you money at the pump*." (See Brochure: 2012 Volkswagen Passat) (Emphasis added).

120.     A Volkswagen 2013 Beetle TDI brochure states:

"Start the TDI® "clean" diesel model and hear the surprisingly quiet purr of ***the first clean diesel Beetle,*** designed for both power and efficiency." (See Brochure: 2013 Volkswagen Beetle) (Emphasis added).

121.     A Volkswagen 2014 Beetle TDI brochure states:

"2.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Beetle TDI has lower $CO_2$ emissions compared to 84% of other vehicles. ***So every getaway you make will be a cleaner one***." (See Brochure: 2014 Volkswagen Beetle) (Emphasis added).

122.     A Volkswagen 2014 TDI Touareg brochure states:

3.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Touareg TDI has lower $CO_2$ emissions compared to 88% of other vehicles. ***So every getaway you make will be a clean one.*** (See Brochure: 2014 Volkswagen Touareg) (Emphasis added).

**2.     Audi's False and Misleading Advertisements**

123.     Audi, like VW, pitched its diesel engines as environmentally friendly, powerful, and efficient. Drawing heavily from the themes in VW's advertisements, Audi deceptively portrayed its Class Vehicles as clean and safe for the environment, unlike the diesels of yesteryear. Examples of such advertisement include:





124.    Audi proclaimed that "[d]iesel [was] no longer a dirty word," but failed to disclose that its vehicles were so dirty that they could not pass emission standards in the U.S. and that the only reason why they were introduced into the stream of commerce here is because Audi fraudulently obtained COCs from the EPA for these vehicles.   With equal audacity, Audi advertised that, by driving an Audi TDI, you could "[p]rotect the environment and look good doing it," while failing to disclose the pernicious NOX spewed into the environment.

125.    Audi also ran numerous TV commercials for its "clean" diesel vehicles, many of which touted the "eco-friendly" characteristics of its diesel technology.   One ad, "The Green Police" (which aired during the 2010 Super Bowl) portrayed a world in which the environmental police ("Green Police") arrested people for using Styrofoam cups, failing to compost, asking for plastic bags at the grocery store, throwing out batteries, and drinking water from plastic bottles. And at a highway checkpoint, the "ECO ROADBLOCK," the Green Police flagged cars that were harmful to the environment:



126.    When the Green Police at the ECO ROADBLOCK see an Audi A3 TDI SportWagen, they give the car a "thumbs up" and allow the driver to bypass the roadblock.



127.    After the white A3 TDI cruises past the other vehicles, the screen fades to black and falsely touts the supposed "green credentials" of the A3 TDI.

128.    Like VW, Audi also made false representations in print brochures available at dealerships and on Audi's website.  For example, an Audi 2011 A3 TDI brochure states:

"With the potent combination of direct diesel injection and turbocharging, the 2.0-liter TDI® clean diesel engine delivers an impressive 236 lb-ft. of torque and produces 140hp. The power and performance is complemented with impressive EPA-estimated 30 MPG city and 42 MPG highway ratings. *Producing 30 percent fewer CO2 emissions than a comparable gasoline engine, the 2.0 TDI clean diesel also meets or exceeds the 50 state emissions requirements.*

\* \* \*

*Long gone are the days of dirty, smoking diesel engines. Audi TDI clean diesel technology is responsible for the cleanest diesel engines in the world*, with 30 percent fewer CO2 emissions than comparable gasoline engines, making it an environmentally friendly alternative to gasoline power. *In fact, TDI clean diesel is compliant with California's ULEV II requirement—the world's most stringent emission standard. The result is a significant reduction in emissions that contribute to global warming."* (See Brochure: 2011 Audi A3) (Emphasis added).

129.    Audi's 2016 A6 and A7 brochures similarly (and falsely) stated that the TDI versions of these cars meet emission rating "ULEV II," and the 2016 A6, A7, and Q5 brochures all similarly stated:

Taking advantage of the greater power density of diesel fuel over traditional gasoline, the available 240-hp 3.0-liter TDI® clean diesel V6 delivers incredible torque (428 lb-ft) and passing power, while boasting impressive fuel efficiency numbers. *It also produces fewer emissions with a combination of Piezo direct injection, a high compression ratio, and innovative after-exhaust treatment that helps eliminate up to 95% of diesel NOx emissions.* (See Brochures: 2016 Audi A6 and 2016 Audi 7) **(**Emphasis added).

130.    An Audi 2016 A8 brochure also listed the TDI models as meeting emission rating "ULEV II," and further stated:

With 240 hp and 428 lb-ft of torque on tap, the available 3.0-liter TDI® clean diesel engine's elasticity in the passing lane is almost as impressive as its ability to take on even the longest road trips. *And with features like AdBlue® exhaust after-treatment helping to make every journey a little cleaner, this is a performance win for all sides.* (See Brochure: 2016 Audi A8) (Emphasis added).

### 3.    Porsche's False and Misleading Advertisements

131.    Porsche similarly exploited the "clean" diesel branding for its Cayenne SUV to falsely convey that the vehicle was environmentally friendly and legal to drive.  The "clean" diesel marketing and advertising for the Cayenne SUV also omitted the material fact that the COC issued

by the EPA for the vehicle was based on a fundamental lie.  Those ads were unfair, deceptive, false, and misleading for the same reasons, as stated above.

132.    For example, Porsche expressly marketed the fuel-efficiency of the Cayenne Diesel, even though such efficiency could not be achieved while complying with applicable emission regulations.



133.    Moreover, the brochure for Porsche's diesel-powered 2013 Cayenne SUV, available online and at dealerships, touted the vehicle's "Intelligent Performance and efficiency— the core characteristics of Porsche engineering."  (See Brochure: 2012 Cayenne Diesel).  It boasted that "[t]his is no ordinary diesel.  This is a Porsche 3.0-liter V6 turbo diesel engine. It's a technological marvel, able to take its unique fuel source and transform it into clean, efficient, and incredibly torque-rich power."  Further, the brochure exclaimed Porsche "refined" diesel engine technology, which made its diesel engine "far advanced from what many people perceive— especially in terms of its acceleration, clean emissions, and quiet running operation."  *Id.*  The brochure even touted its "low emissions" on a page entitled: "A cleaner diesel. Exhaust technologies."  *Id.*  Porsche described the exhaust system and stated that its exhaust technologies "help to ensure the reduction of harmful pollutants into the environment and make the Cayenne diesel compliant with U.S. emission standards."  *Id.*  Unfortunately, these statements were all untrue.

### 4. **Volkswagen's Nationwide Advertising Campaign Was Highly Effective and Volkswagen Profited Handsomely from Selling the Class Vehicles.**

134.     Volkswagen's massive advertising campaign for the Class Vehicles proved highly successful, as Volkswagen took a commanding lead in U.S. diesel vehicle sales.  Volkswagen's diesel vehicles were profiled on environmental websites and blogs as the responsible choice, relying on Volkswagen's representations of high mileage and low emissions.  (See, e.g., Jim Motavalli, *Clean diesel: What you need to know*, Mother Nature Network (Apr. 5, 2013); Anthony Ingram, 2015 VW Golf, Beetle, Passat, Jetta All Get New Clean Diesel Engine, Green Car Reports (Mar. 19, 2014)).

135.     And the success of Volkswagen's advertising campaign resulted in skyrocketing sales.  In 2007, VW America sold 230,572 cars in the United States — a far cry from Winterkorn's goal of 800,000 sales in 2018—and a negligible number of those were diesel vehicles.  In fact, in 2007 only approximately 16,700 light-duty diesel vehicles were sold in the United States.  (See Paul Eisenstein, *Volkswagen Scandal Delivers 'Black Eye' to Diesel Tech as a Whole*, NBC News (Sept. 24, 2015)).  As Volkswagen released its "clean" diesel lineup and fraudulent advertising campaign, sales of the Class Vehicles grew dramatically, from 43,869 in 2009 to a peak of 111,285 in 2013.  (See William Boston, *Volkswagen Emissions Investigation Zeroes In on Two Engineers*, Wall Street Journal (Oct. 5, 2015)).  This largely accounted for VW America's sales growth to over 400,000 sales in 2013, nearly double the sales in 2007.  (See *Volkswagen Reports December 2013 and Year-End Results*, Volkswagen (Jan. 3, 2014).  Likewise, the Class Vehicles contributed significantly to Audi's growth from 93,506 sales in 2007 to 182,011 in 2014.  (See *Audi achieves fifth straight year of U.S. record sales with 182,011 vehicles in 2014*, Audi USA (Jan., 5, 2015).

136.     Volkswagen reaped considerable benefit from their fraud, charging premiums of thousands of dollars for the "clean" diesel models of the Class Vehicles.

137.   Volkswagen also engaged in an aggressive lobbying campaign for federal tax credits for the Class Vehicles, akin to the credits offered for electric cars.  (See Steve Birr, *Volkswagen Lobbied Obama Administration for Green Tax Credits*, The Daily Caller  (Oct. 13, 2015)).  These efforts were met with some success, as many of the Class Vehicles were deemed eligible for federal income tax credits in order to spur "clean" diesel technology.  In fact, at least $78 million was earmarked for TDI Jetta buyers in 2009 and 2010.  (See *Volkswagen shares plunge on emissions scandal; U.S. widens probe*, Reuters (Sept. 21, 2015).

### D.      Defendants' Dirty Diesel Scheme Starts to Unravel

138.   Defendants' illegal scheme started to unravel approximately five years after Volkswagen introduced its first diesel model containing the defeat device into the U.S. stream of commerce.  In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published results of a study commissioned by the International Council on Clean Transportation ("ICCT"), which found that certain of the Class Vehicles' real world NOX and other emissions exceeded the allowable EPA emission standards.  (See *Final Report: In Use Emissions Testing of Light-Duty Diesel Vehicles in the United States*, International Council on Clean Transportation (May 15, 2015).

139.   The ICCT researchers had been comparing the real-world performance of "clean" diesel vehicles in Europe with reported results and noted numerous discrepancies.  Since the U.S. emission regulations were significantly more stringent than its European counterparts, the ICCT sought to test the equivalent U.S. "clean" diesel cars, presuming that they would run cleaner. West Virginia University's team of emissions researchers was a qualified and enthusiastic partner, as they had already been engaged in the study of heavy truck emissions.

140.   Shockingly, the study showed that, contrary to testing lab results, real world driving of Volkswagen "clean" diesel vehicles produced levels of NOX up to 40 times higher than legal limits promulgated by the EPA and CARB:



Average emissions of nitrogen oxides in on-road testing

Source: Arvind Thiruvengadam, Center for Alternative Fuels, Engines and Emissions at West Virginia University

141.    The results of this study prompted an immediate investigation by the EPA and CARB, both of whom demanded an explanation from Volkswagen.  Despite knowing that the Class Vehicles contained illegal emission systems — and defeat devices intentionally designed to comply with emission standards on a test bench but not under normal driving operation and use — Volkswagen failed to come clean.  Instead, Volkswagen denied the allegations and blamed faulty testing procedures.

142.    In December 2014, Volkswagen issued a recall purportedly to update emission control software in the Class Vehicles, and CARB (along with the EPA) conducted follow-up testing of the Class Vehicles in the laboratory and during normal road operation.  CARB attempted to identify the source and nature of the Class Vehicles' poor performance and determine why their

on-board diagnostic systems did not detect the increased emissions.  None of the technical issues suggested by Volkswagen adequately explained the NOX test results as confirmed by CARB.

143.    Dissatisfied with Volkswagen's explanations, EPA and CARB officials finally threatened to withhold the COCs for Volkswagen's 2016 diesel vehicles until it adequately explained the anomaly of the higher emissions. Then, and only then, did Volkswagen finally relent and start to lift the curtain on its illegal scheme.

### E.    Once Caught, Volkswagen Admitted its Fraud – in Part

144.    On September 3, 2015, Volkswagen officials finally disclosed at a meeting with the EPA and CARB that it had installed a sophisticated software algorithm on the 2.0-liter Class Vehicles, which could detect when the car was undergoing emission testing on a test bench and switch the car into a cleaner running mode.  During that meeting, Volkswagen admitted that the software was a "defeat device" forbidden by the CAA and state regulations.

145.    On September 18, 2015, the EPA issued a Notice of Violation of the CAA (the "First NOV") to VW AG, Audi AG, and VW America for installing illegal defeat devices in 2009-2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines.  That same day, CARB sent a letter to VW AG, Audi AG, and VW America, advising that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

146.    Two days later, Volkswagen made its first public admission of wrongdoing in a written statement and video by VW AG's then-CEO Winterkorn (who would soon resign as a result of this scandal), posted on VW AG's website.  Winterkorn's statement read, in pertinent part:

> "I personally am deeply sorry that we have broken the trust of our customers and the public. We will cooperate fully with the responsible agencies, with transparency and urgency, to clearly, openly, and completely establish all of the facts of this case. Volkswagen has ordered an external investigation of this matter. . . . We do not and will not tolerate violation of any kind of our internal rules or of the law." (See *Statement of Prof. Dr. Martin Winterkorn, CEO of Volkswagen AG*, Volkswagen AG (Sept. 20, 2012).

In his video, Winterkorn further apologized by stating:

> "The irregularities in our group's diesel engines go against everything Volkswagen stands for. To be frank with you, manipulation at Volkswagen must never happen again. . . . I personally am deeply sorry that we have broken the trust of our customers. I would like to make a formal apology to our customers to the authorities and to the general public for this misconduct." (See Joe Lorio, *VW Chairman Martin Winterkorn Releases Video Addressing Scandal, Is Not Stepping Down*, Car and Driver (Sept. 22, 2015).

147.    That same day, Volkswagen confirmed that it had ordered dealers to stop selling both new and used vehicles with 2.0-liter diesel engines. (See Jack Ewing, *Volkswagen to Stop Sales of Diesel Cars Involved in Recall*, N.Y. Times (Sept. 20, 2015). Volkswagen continued to sell its 3.0 liter diesel models, despite containing similar, but not-yet-disclosed defeat devices.

148.    On September 21, 2015, Volkswagen spokesman John Schilling stated in an email that Volkswagen was "committed to fixing this issue as soon as possible" and to "developing a remedy that meets emissions standards and satisfies our loyal and valued customers." (See Jad Mouadwad, et al., *The Wrath of Volkswagen's Drivers*, N.Y. Times (Sept. 21, 2015).

149.    Defendant Horn, President and CEO of VW America, echoed this sentiment when he took the stage later that evening at a launch event for the 2016 Volkswagen Passat in Brooklyn, New York, telling reporters:

> "Our company was dishonest, with the EPA and the California Air Resources Board, and with all of you and in my German words, ***we have totally screwed up***. We have to make things right, with the government, the public, our customers, our employees and also very important, our dealers." (See Christine Seib, *Volkswagen's US Boss: We Totally Screwed Up*, CNBC (Sept. 22, 2015). (Emphasis added.)

Defendant Horn's presentation on the new Passat, notably, did not promote the environmental efficiency of the car's "clean" diesel model.

150.    On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emission testing by U.S. regulators. Contemporaneously, Volkswagen announced that it had set aside reserves of 6.5 billion euros ($7.3 billion) in the third quarter to address the matter. (See Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015).

151.    On September 23, 2015, Winterkorn resigned from his position as CEO of VW AG. In his resignation statement, Winterkorn insisted that he was not personally involved in the emissions scandal: "Above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group. I am doing this in the interests of the company even though I am not aware of any wrongdoing on my part."  (See Graham Ruddick, *Volkswagen chief quits over emissions scandal as car industry faces crisis*, The Guardian (Sept. 23, 2015).

152.    Following Winterkorn's resignation, Volkswagen released a statement that it had set up a special committee to lead its own inquiry into the scandal and expected "further personnel consequences in the next days."  It added: "The internal group investigations are continuing at a high tempo. All participants in these proceedings that have resulted in immeasurable harm for Volkswagen will be subject to the full consequences."  However, the committee insisted that Winterkorn "had no knowledge of the manipulation of emissions data."  *Id.*

153.    On September 25, 2015, Matthias Müller, the Chairman of Porsche AG, was named as Winterkorn's successor. Immediately upon assuming his new role, Müller issued a press release stating:

> My most urgent task is to win back trust for the Volkswagen Group—by leaving no stone unturned and with maximum transparency, as well as drawing the right conclusions from the current situation. Under my leadership, Volkswagen will do everything it can to develop and implement the most stringent compliance and governance standards in our industry. (See *Matthias Müller appointed CEO of the Volkswagen Group*, Volkswagen AG (Sept. 25, 2015).

154.    On October 8, 2015, Defendant Horn made frank admissions of culpability in his testimony before the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations.  Under oath, Defendant Horn testified: "On behalf of our Company, and my colleagues in Germany, I would like to offer a sincere apology for Volkswagen's use of a software program that served to defeat the regular emissions testing regime." (See Bill Chappell, '*It Was Installed For This Purpose,' VW's U.S. CEO Tells Congress About Defeat Device*, NPR (Oct. 8, 2015)).  In response to a question from the Subcommittee Chairman, Representative Tim Murphy,

whether the software was installed "for the express purpose of beating tests," Horn testified, "it was installed for this purpose, yes." *Id.*

155.    On November 2, 2015, the EPA issued a second Notice of Violation of the CAA (the "Second NOV") to VW AG, Audi AG, and VW America, this time directed at the larger 3.0-liter, 6-cylinder diesel models—the same vehicles that Volkswagen continued to sell through its dealers after the First NOV.  (See Letter from Susan Shinkman, Director, EPA Office of Civil Enforcement to Volkswagen dated Nov. 2, 2015).  The Second NOV, which was also issued to Porsche AG and Porsche America, alleged that Volkswagen had installed illegal defeat devices in certain vehicles equipped with 3.0-liter diesel engines for model years 2014–16.  Although not identical, the cheating alleged of Volkswagen in the Second NOV concerned essentially the same mechanism Volkswagen used—and admitted to using—in the First NOV.

156.    However, shortly after it received the Second NOV, Volkswagen fired back at the EPA's new claims of fraud, denying that it installed defeat device software in the identified 3.0-liter diesel vehicles. In response to the Second NOV, Volkswagen issued the following bold statement: "Volkswagen AG wishes to emphasize that no software has been installed in the 3.0-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."  (See Emily Field, *Volkswagen Slams Newest EPA Emissions Fraud Claims*, Law360 (Nov.3, 2015)).

157.    Yet, the following day, despite Volkswagen's insistence that the 3.0-liter diesel emission system was legal, Volkswagen ordered dealers to stop selling all six models at issue in the Second NOV, in addition to the Audi Q7, which was also equipped with a 3.0-liter diesel engine.  (See Paul Lienert, Volkswagen tells dealers to stop selling some 3.0 V6 diesel models, Reuters (Nov. 4, 2015)).

158.    On November 4, 2015, following its directive to halt sales of the 3.0-liter diesel models, Volkswagen announced that an internal investigation revealed "unexplained inconsistencies" with the carbon-dioxide output of 800,000 of its gasoline-powered vehicles.  (See Benedikt Kammel, VW Emissions Issues Spread to Gasoline Cars, Bloomberg (Nov. 3, 2015)).

159.    On November 22, 2015, after almost three weeks of denying the EPA's allegations contained in the Second NOV, Audi finally admitted that defeat device software was installed in all of its Class Vehicles.  Specifically, Audi stated that it had failed to disclose three auxiliary emissions control devices in its 3.0-liter diesel engines to U.S. regulators, and further admitted: "One of them is regarded as a defeat device according to applicable U.S. law. Specifically, this is the software for the temperature conditioning of the exhaust-gas cleaning system."  (See Statement on Audi's discussions with the U.S. environmental authorities EPA and CARB, Volkswagen AG (Nov. 23, 2015)).  This admission came almost three months after Volkswagen's initial, more limited *mea culpa*.

160.    Still, despite the admissions and apologies that followed each time a Volkswagen lie was exposed, it became apparent that Volkswagen was not ready to fully accept responsibility for its actions.  Indeed, merely one month after Volkswagen admitted to the findings in the Second NOV, Hans-Gerd Bode, Volkswagen's Group Communications Chief, told a group of reporters: "I can assure you that we certainly did not, at any point, knowingly lie to you. . . .  We have always tried to give you the information which corresponded to the latest level of our own knowledge at the time."  (See Andreas Cremer, *Das Auto' no more:  Volkswagen plans image offensive*, Reuters (Dec. 22, 2014)).

161.    On January 4, 2016, the DOJ, on behalf of the EPA, filed a civil complaint against VW AG, VW America, Volkswagen Group of America Chattanooga Operations LLC, Audi AG, Audi, Porsche AG, and Porsche America for injunctive relief and the assessment of civil penalties for their violations of the CAA.  In addition to alleging the various violations of the CAA, the complaint states that the Defendants impeded the government's efforts to learn the truth about the emission irregularities related to the Class Vehicles with material omissions and misleading information.

162.    On January 10, 2016, in an interview with NPR at the North American International Auto Show, Müller claimed that Volkswagen **did not lie** to U.S. regulators about emissions

problems with its diesel engines, and suggested that the whole thing had been a misunderstanding of U.S. law.  Müller stated:

> "Frankly spoken, it was a technical problem. We made a default, we had a . . . not the right interpretation of the American law. And we had some targets for our technical engineers, and they solved this problem and reached targets with some software solutions which haven't been compatible to the American law. That is the thing.  And the other question you mentioned—it was an ethical problem?  I cannot understand why you say that. . . . We didn't lie. We didn't understand the question first. And then we worked since 2014 to solve the problem."  (See Sonari Glinton, *'We Didn't Lie,' Volkswagen CEO Says Of Emissions Scandal*, NPR (Jan. 11, 2016)).

163.    Moreover, since the fraud was first exposed, Volkswagen has consistently denied that its top executives were involved with, or had knowledge of, the fraudulent scheme, instead pinning the blame on the work of a few rogue engineers.

164.    As an alternative tactic, during defendant Horn's Congressional hearing on October 8, 2015, Horn testified that the installation of the defeat device in certain Volkswagen diesel vehicles was the work of "a couple of software engineers who put this in for whatever reason."  (See Paul A. Eisenstein, *Could Rogue Software Engineers Be Behind VW Emissions Cheating?*, NBC News (Oct. 9, 2015)).  Horn's explanation is not only contrary to prior admissions, but entirely implausible.

165.    To date, at least eleven of Volkswagen's top executives have either resigned under pressure or been fired.  Among the top executives dismissed are defendant Winterkorn, CEO and Chairman of Volkswagen, who resigned almost immediately once the scandal became public; Dr. Ulrich Hackenberg, a top engineering boss in the Audi Group, who was suspended and later resigned; Heinz-Jakob Neusser, described as a Volkswagen "development" boss, who was suspended and later resigned; and Wolfgang Hatz, Porsche's "development" boss and previously Volkswagen's head of engine development, who was suspended and then resigned.  Furthermore, one of Volkswagen's top advertising executives purportedly "resigned" (although the company has said that the resignation was unrelated to the present scandal), and VW America has replaced their general counsel and head of public affairs, David Geanacopoulos. Just recently

Frank Tuch, VW AG's head of quality assurance, also resigned, his departure likely tied to leadership overhauls as Volkswagen's internal investigations continue.

166.    That a few rogue engineers could orchestrate this massive, worldwide scheme is implausible not only because of the firings of the above-listed executives, but also because Volkswagen has been implicated using not just one, but *two* sophisticated defeat device software programs, in *two* separate engines designed and manufactured by different engineers in different corporate facilities.  In addition, more than a dozen different Class Vehicles, involving three separate brands—Volkswagen, Audi and Porsche—have been implicated in a fraud that began more than a decade ago.

167.    On October 17, 2015, Reuters reported that anonymous insiders, including a Volkswagen manager and a U.S. official close to the government's investigation of the company, claimed that Volkswagen made several modifications to its emission defeat device software over the seven years the company has admitted to cheating.  (See Andreas Cremer, et al., *VW made several defeat devices to cheat emissions tests: sources*, Reuters (Oct. 17, 2015)).  Such incremental updates to the software, which were made to accommodate new generations of engines during that timeframe, evidences a larger group of employees making an ongoing effort to continue their deception.

168.    As discussed above, on January 22, 2016, Germany's *Sueddeutsche Zeitung* newspaper reported that Volkswagen's development of defeat device software to cheat diesel emissions tests was an "open secret" in its engineering development department.  Staff members in engine development have stated that they felt pressure from the top of Volkswagen's corporate hierarchy to find a cost-effective solution to develop clean diesel engines to increase U.S. market share.  Rather than concede that such engines could not be built (*i.e.*, were "impossible" as R&D chief Hatz once proclaimed), the development team decided to push ahead with manipulation. (See Georgina Prodhan, *Volkswagen probe finds manipulation was open secret in department: newspaper*, Reuters (Jan. 23, 2016)).

169.    Quoting documents from Volkswagen's internal investigation, which included testimony from a staff member who took part in the fraud, the German newspaper said: "Within the company there was a culture of 'we can do everything', so to say something cannot be done, was not acceptable. . . .  Instead of coming clean to the management board that it cannot be done, it was decided to commit fraud."  *Id.*  The newspaper further reported that staff in Volkswagen's engine development department took comfort from the fact that regulators would not be able to detect the fraud using conventional examination techniques.

170.    The role of Volkswagen's top management in the fraud has recently come under increased scrutiny after reports have emerged that Winterkorn was aware that Volkswagen was rigging emissions tests on its vehicles more than a year before the scandal emerged, yet did nothing to stop the practice.  (See Geoffrey Smith, *VW's ex-CEO Winterkorn 'Knew About Defeat Device in Early 2014'*, Fortune (Feb. 15, 2016)).

171.    According to German newspaper *Bild-Zeitung*, Winterkorn and other high-level Volkswagen managers were warned by a senior executive about the risk of a U.S. investigation into the use of the defeat devices back in May 2014.  *Id.*  The newspaper reported that the warning came in the form of a letter from Bernd Gottweis, an employee known internally as the "fire-fighter," who led a team called the "Product Safety Taskforce," which concentrated on crisis prevention and management.  The letter, which was uncovered by the internal investigation carried out on Volkswagen's order, stated: "There is no well-founded explanation for the dramatically higher NOX emissions that can be given to the authorities.  It is to be suspected, that the authorities will examine the VW systems to see whether Volkswagen has installed engine management software (a so-called Defeat Device)."

172.    The newspaper also reported that a senior Volkswagen manager had admitted the true level of emissions to a CARB official on August 5, 2015, over a month before the EPA issued the First NOV I, and that Volkswagen brand chief Herbert Diess had convened meetings on August 24th and August 25th to discuss how to react to the scandal that was about to break.  *Id.*

173.    The letter, of which *Bild-Zeitung* claims to have a copy, is the second leak suggesting that knowledge of the emissions problems and use of the defeat devices extended far higher, far earlier, than Volkswagen has admitted.  Indeed, the German magazine *Manager* has reported that Volkswagen's management had already discussed the issue in the spring of 2014 in reference to a letter received from the EPA.  *Id.*  The revelations from these reports directly contradict arguments made by Winterkorn and Horn that they were unaware of the use of defeat devices applied specifically to circumvent U.S. regulations.

174.    At a December 10, 2015, press conference, during which Volkswagen discussed preliminary results of their internal investigation, executives summed up the state of affairs, and admitted that Volkswagen had installed defeat devices to take shortcuts around engineering challenges.  Faced with "[s]trict and significantly toughening NOX limits," Volkswagen knew those "NOX limits could not be met with [their] technological design" for lean NOX traps so instead they dealt with the problem by installing defeat devices on those Class Vehicles.  The Class Vehicles with urea treatments faced a separate problem: the urea tanks were too small for consumers to maintain urea levels at standard maintenance intervals.  Volkswagen also took shortcuts around these engineering challenges by implementing a defeat device to reduce urea consumption and illegally stretch the capacity of its urea tanks outside of test conditions. Volkswagen concluded this presentation by implicitly acknowledging the toxicity of its corporate culture, as Volkswagen announced it would establish a "new mindset" among Volkswagen leadership that has "[m]ore capacity for criticism."   (See Volkswagen AG, *The Volkswagen Group is moving ahead; Investigation, customer solutions, realignment*, Volkswagen AG (Dec. 10, 2015)).

175.    The entire after-the-fact chronology and explanation of how and why Volkswagen perpetrated its fraud is set forth in its December 10, 2015 presentation.  *Id.*

### F.    Volkswagen's Failed Attempts at Remedial Action

176.    While Volkswagen has repeatedly expressed its commitment to fix the problem and restore the public's trust, its attempts at remedial action have been wholly inadequate.

177.    On November 8, 2015, Volkswagen announced a "goodwill package" to owners of Class Vehicles subject to the First NOV, but not the Second NOV.  (See Joseph White, et al., *Volkswagen Offers U.S. Diesel Owners $1,000 I Credit Cards*, Reuters (Nov. 9, 2015)).  The "goodwill package" consisted of a $500 Volkswagen Prepaid Visa Loyalty Card, a $500 Volkswagen Dealership Card, and 24-hour Roadside Assistance for three years.  Volkswagen is on record that this package is provided to consumers "without any strings attached," and disavowed any attempt to claim offset for this "goodwill."  U.S. Senators Richard Blumenthal and Edward J. Markey decried the program as "insultingly inadequate" and "a fig leaf attempting to hide the true depths of Volkswagen's deception."  Volkswagen has since expanded the "goodwill package" to owners of 3.0-liter TDI Touareg models; however, the remaining vehicles at issue in the Second NOV are still excluded.

178.    While Volkswagen claims to have a software fix for European cars, it has struggled to find a solution for U.S. cars.  In a statement discussing the European fix, it said:

> Due to far stricter nitrogen oxide limits in the United States, it is a greater technical challenge to retrofit the vehicles such that all applicable emissions limits can be met with one and the same emissions strategy. . . . To this end, Volkswagen is cooperating closely with the United States Environmental Protection Agency and the California Air Resources Board.  (See Jay Ramey, VW chairman Poetsch: Company 'tolerated breaches of rules', Autoweek (Dec. 10, 2015)).

179.    However, that cooperation has not yet been met with any success.  On January 12, 2016, CARB rejected Volkswagen's proposal to recall and remedy Class Vehicles equipped with 2.0-liter diesel engines, finding that the plans were "incomplete, substantially deficient, and fall far short of meeting the legal requirements to return these vehicles to the claimed certification configuration."  (See Ashlee Kieler, California Rejects VW Proposal to Fix Emissions-Cheating Vehicles, Consumerist (Jan. 12, 2016)).  Following the rejection, CARB initiated an enforcement action against Volkswagen and CARB Chair Mary D. Nichols released the following statement:

> Volkswagen made a decision to cheat on emissions tests and then tried to cover it up. They continued and compounded the lie and when they were caught they tried to deny it. The result is thousands of tons of nitrogen oxide that have harmed

the health of Californians. They need to make it right. Today's action is a step in the direction of assuring that will happen.  *Id.*

Shortly thereafter, the EPA issued a statement of its own backing CARB's decision not to approve Volkswagen's recall plans.  *Id.*

### G.    Volkswagen Caused Billions of Dollars in Harm to U.S. Consumers

180.    Volkswagen's illegal scheme duped hundreds of thousands of U.S. consumers into buying Class Vehicles that never should have left the factory, let alone been sold, at a cost of billions of dollars.

181.    In addition, Volkswagen charged premiums of several thousands of dollars for the Class Vehicles, as compared to non-diesel vehicles.  Using recent pricing figures, it has been estimated that Volkswagen charged premiums of from 7 to 27 percent for its 2.0-liter diesel models.  (See Kyle Stock, Volkswagen's Other Diesel Ruse:  Premium Pricing, Bloomberg (Sept. 23, 2015)).  For example, the non-diesel 2015 Passat started at $21,340, while the "clean" diesel fetched at least $27,100.  *Id.*  Though the "clean" diesel model achieves greater mileage, the premium—some $5,755—would buy enough gas to drive the non-diesel model approximately 88,000 miles at current gas prices.  *Id.*

182.    Class members purchased the Class Vehicles only because Volkswagen fraudulently obtained COCs from the EPA to illegally introduce them into the U.S. stream of commerce.  In addition, Volkswagen engaged in a false and misleading advertising campaign that the "clean" diesel engine system was an environmentally friendly, fuel efficient, and low emission vehicle with high performance.  Plaintiffs and Class members bought or leased the Class Vehicles based on these claims, and were harmed as the cars were neither legal nor clean.

183.    While Volkswagen once claimed that these vehicles would have "a higher resale value versus comparable gasoline vehicles" (see Audi of America, TDI® clean diesel (2015)), the cars are, in fact, now virtually unsellable and subject to a recall for the indefinite future.  With the revelations of Volkswagen's fraud, the Class Vehicles have decreased sharply in value. Within

several weeks of the announcement of Volkswagen's emissions fraud, the value of the Class Vehicles plummeted by nearly 16%. (See Ryan Beene, *Used VW diesel prices nosedive as fix remains unclear*, Autoweek (Oct. 26, 2015)). In fact, VW, Audi, and Porsche have halted all sales of the Class Vehicles, new or used, so that even dealers are stuck with tainted, stigmatized, and unsellable Class Vehicles.

184. Adding insult to injury, the diesel vehicles that Volkswagen peddled as environmentally responsible spew pollutants up to 40 times the legal limits. It is a cruel irony that Volkswagen has forced Plaintiffs to either sideline their cars (which most people cannot practically do) or drive the Class Vehicles with the knowledge that they are emitting toxic NOX far in excess of legal limits, exactly what they paid a premium to avoid. Consumers are justifiably outraged about the untenable position Volkswagen has put them in.

185. Moreover, many Plaintiffs and Class members purchased the Class Vehicles with financing in the form of car loans or leases. The plunge in value of the Class Vehicles has caused some Class members to be upside down on their loans, meaning that Class members now owe—often to Volkswagen's financing arm—more than the vehicle is worth—and for a car that is not legal, to boot.

186. Volkswagen cannot fix the Class Vehicles without degrading their performance, including horsepower and/or efficiency. As a result, even if Volkswagen is able to make the Class Vehicles compliant, Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as promised. This will necessarily result in a diminution in value of every Class Vehicle.

187. Moreover, many Class members purchased extended warranties for their Class Vehicles, intending to own the vehicles beyond the initial warranty period. Class members no longer want to own the Class Vehicles due to revelations of Volkswagen's fraud and, when they sell them, they will lose the value of the extended warranties that they purchased.

188.    The harm described herein is quantifiable and ongoing.    As a result of Volkswagen's illegal scheme, owners and lessees of the Class Vehicles have suffered losses—and continue to lose—money and property in the magnitude of billions of dollars.

### H.    Defendants' Illegal Scheme Caused Health Risk and Quantifiable Harm to the Environment

189.    Defendants' illegal scheme has also caused significant injury to public health, including increased health risks to Plaintiffs and Class members, as well as harm to the environment due to the Class Vehicles' emission of hazardous pollutants far in excess of legal limits.

190.    As mentioned above, NOX is a hazardous pollutant and "an indirect greenhouse gas" that contributes to the formation of ground-level ozone, a greenhouse gas, and can travel hundreds of miles from the source of emission.  Ozone is a colorless and odorless gas that, even at low levels, can cause cardiovascular and respiratory health problems, including chest pain, coughing, throat irritation, and congestion.  The human health concerns from over-exposure to NOX are well established, and include negative effects on the respiratory system, damage to lung tissue, and premature death.  NOX can penetrate deeply into sensitive parts of the lungs, and is known to cause or worsen respiratory diseases like asthma, emphysema, and bronchitis, as well as aggravate existing heart disease. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are particularly susceptible to such adverse health effects, though its effects are felt on all of society.  Public health literature has firmly established a direct link between marginal short run fluctuations in ambient ozone concentrations and mortality rates.  (Bell *et al.*, *Ozone and Short-term Mortality in 95 US Urban Communities, 1987-2000*, JAMA (Nov. 17, 2004), show evidence of a short-term 10 parts per billion (ppb) rise in ozone concentrations would result in 3,767 additional premature deaths across 95 urban areas in the U.S. For evidence regarding ozone's morbidity and environmental impacts, *see* EPA (2006), Moretti and Neidell (2008), and Neidell (2004, 2009)).

191.    Tracing NOX emissions in one location into economic damages to health can be done through a model that translates the ground-level emissions of NOX in one location into ozone damages everywhere, as NOX travels and reacts in spatially heterogeneous ways across the country. One such model is the AP2 Model (Muller, 2015), which has county level resolution, translates NOX emissions at ground level (and a variety of other pollutants) into economic damage across all other counties in the U.S. and aggregates the results.

192.    According to the WVU study, Figure 1 below demonstrates an estimate of marginal damages for driving a representative VW 3.0 TDI Jetta (just one of many models of Class Vehicles), emitting 1.5g of NOX/km for 100,000 miles.  (The model does not include damages on crops or effects on morbidity, so it is a strict lower bound.  It uses the Bell, *et al.* (2004) dose response curve for ozone and a conservative value of a statistical life (VSL) of $2 million as applied in Müller, Mendelsohn and Nordhaus (2011).  The standard requires a NOX limit per kilometer of 0.043 grams.  The lower range of the vehicle tested by WVU was 0.61 grams per kilometer and the upper bound was 1.5 grams per kilometer.  It is possible to calculate the damages from a vehicle driven for 100,000 miles in any of the over 3,000 counties in the U.S. For the low end of the range of the Jetta test (0.61 g/km), a vehicle driven 100,000 miles emits an additional 201 pounds of NOX above a compliant car.  For the high end of the range of the Jetta test (1.5 g/km), a vehicle driven 100,000 miles emits an additional 516 pounds of NOX above a compliant car.  Figure 1 applies these numbers to the AP2 Model to illustrate the physicality of ozone formation).



193.    Figure 1 (above) displays the spatial damage distribution across the U.S. for the high emitting Jetta. Figure 2 (below) displays the distributions of damages for the low and high emitting versions of the Jetta and Passat for 100,000 miles as tested by WVU.  (In addition to the Jetta assumptions described, *supra*, for the low end of the range of the Passat test (0.34 g/km), a vehicle driven 100,000 miles emits an additional 105 pounds of NOX above a compliant car. For the high end of the range of the Passat test (0.67 g/km) a vehicle driven 100,000 miles emits an additional 222 pounds of NOX above a compliant car. Figure 1 applies these numbers to the AP2 Model to illustrate the physicality of ozone formation).  The spatial patterns are not affected by the difference in emissions by vehicle type and emissions scenario, yet the overall range of damages is. The range of damages for the Jetta under the high emissions scenario is roughly $62 to $1,346. The range for the vehicle with lowest emissions (Passat, low) is roughly $13 to $274.



194.    In addition, as a result of the negative environmental and health impacts, one environmental research paper has estimated that the excess emissions from the Class Vehicles between 2008 and 2015 will cause nearly 60 early deaths with a monetized cost of $450 million. (See Steven R H Barrett, et al*., Impact of the Volkswagen emissions control defeat device on US public health*, IOP Science (Oct. 29, 2015)).  Other reports have estimated that the defeat devices

"allowed VWs to spew enough pollution to cause somewhere between 16 and 94 deaths over seven years."  (See Seth Borenstein, *Volkswagen's emissions cheating likely caused dozens of deaths in the US*, Business Insider (Oct. 5, 2015)).  Regardless of the precise number of deaths, the serious environmental and physical harm will continue to grow as long as the Class Vehicles remain on the roads.

195.    The notorious legacy of Defendants' unprecedented fraud will live long and spread far. Defendants' conduct was, and the impact of the conduct remains, highly reprehensible within the meaning of that term, as used by the United States Supreme Court in its jurisprudence guiding the calculation and scaling of punitive damages. The conduct alleged herein involved repeated, purposeful actions, was the result of intentional deceit, left Plaintiffs defrauded and without remedy, and evinced an indifference and reckless disregard of public health.

196.    Plaintiffs and Class members, whose unwitting and undesired operation of the Class Vehicles is implicated in the environmental impact of Defendants' scheme, have a real, compelling, and express interest in effectuating and expediting the necessary repairs and reparations to the environment, and in assisting governmental efforts to do so.  It is practicable as well as necessary to remediate, mitigate, and offset this harm.  For example, the odometer readings of Class members' vehicles, which are practical to obtain and total, provide a ready measure upon which to base monetary offsets to be imposed upon Defendants, and collected by the appropriate governmental entities and used to repair the environment.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

197.    The tolling doctrine was made for cases of concealment like this one.  Plaintiffs and class members did not discover, and could not have discovered through the exercise of reasonable diligence, that defendants had conspired to install software that would evade emissions regulations, and that Volkswagen was concealing and misrepresenting the true emissions levels of its vehicles.

198.    Defendants' fraud was elaborate and well concealed.  Indeed, the EPA and CARB uncovered the software manipulation only through a sophisticated and costly investigation involving highly technical equipment.

199.    Plaintiffs and Class members had no realistic ability to discover the presence of the defeat devices, or to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the public through the September 18, 2015, and November 2, 2015, NOVs.

200.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

### Fraudulent Concealment

201.    All applicable statutes of limitation have also been tolled by Volkswagen's knowing, active and ongoing fraudulent concealment of the facts alleged herein.

202.    Defendants have known of the defeat devices installed in the Class Vehicles since at least 2009 when Volkswagen began installing them.  Since then Volkswagen has intentionally concealed from or failed to notify Plaintiffs, Class members, and the public of the defeat devices and the true emissions and performance of the Class Vehicles.

203.    There is no question that Volkswagen installed the defeat devices intentionally to deceive, regulators, and the public, as Volkswagen has publicly conceded.

204.    Despite knowing about the defeat device and unlawful emissions, Volkswagen did not acknowledge the problem, and in fact actively concealed it, until after the EPA issued its NOVs on September 18, 2015 and November 2, 2015.

205.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and Volkswagen's active concealment of the facts alleged herein.

### Estoppel

206.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, including their

emissions systems and their compliance with applicable federal and state law. Instead, Volkswagen actively concealed the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Class Vehicles.

207.    Plaintiffs and Class members reasonably relied upon Volkswagen's knowing and affirmative misrepresentations and/or active concealment of these facts.

208.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## CLASS ACTION ALLEGATIONS

209.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes"); on their federal and state claims as the purchasers and lessees of the following Class Vehicles:

**2.0-liter Class Vehicles**
| | |
|---|---|
| Volkswagen Jetta TDI | 2009-2015 |
| Volkswagen Jetta SportWagen TDI | 2009-2014 |
| Volkswagen Beetle TDI | 2012-2015 |
| Volkswagen Beetle Convertible TDI | 2012-2015 |
| Audi A3 TDI | 2010-2015 |
| Volkswagen Golf TDI | 2010-2015 |
| Volkswagen Golf SportWagen TDI | 2015 |
| Volkswagen Passat TDI | 2012-2015 |

**3.0-liter Class Vehicles**
| | |
|---|---|
| Volkswagen Touareg TDI | 2009-2016 |
| Porsche Cayenne Diesel | 2013-2016 |
| Audi A6 Quattro TDI | 2014-2016 |
| Audi A7 Quattro TDI | 2014-2016 |
| Audi A8 TDI | 2014-2016 |
| Audi A8L TDI | 2014-2016 |
| Audi Q5 TDI | 2014-2016 |
| Audi Q7 TDI | 2009-2016 |

210.    The proposed Classes are defined as:

## Nationwide Class

All persons and entities in the United States who purchased or leased a Class Vehicle.

### Illinois Class

All persons and entities in the state of Illinois who purchased or leased a Class Vehicle.

### Minnesota Class

All persons and entities in the state of Minnesota who purchased or leased a Class Vehicle.

### Missouri Class

All persons and entities in the state of Missouri who purchased or leased a Class Vehicle.

### South Dakota Class

All persons and entities in the state of South Dakota who purchased or leased a Class Vehicle.

### Wisconsin Class

All persons and entities in the state of Wisconsin who purchased or leased a Class Vehicle.

211.    Excluded from the Classes are: (A) Defendants, including any entity or division in which Defendants have a controlling interest, as well as their agents, representatives, officers, directors, employees, trustees, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; (B) the Judges to whom this case is assigned, their staff, and their immediate families; and (C) governmental entities.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

212.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

213.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

### Numerosity and Ascertainability

214.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  There are no less than five hundred thousand members in the Nationwide Class, and at least hundreds of members in each State Class. The precise number and identities of Nationwide Class and State Class members may be ascertained from Volkswagen's books and records and motor vehicle regulatory data. Defendants have comprehensive lists of Class Vehicle owners and lessees in their possession, and are using them to communicate in writing to the Class members.  To date, approximately 580,000 vehicles identified as Class Vehicles have been sold in the United States.  Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court.  Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

### Typicality

215.    The claims of the representative Plaintiffs are typical of the claims of the other Class members in that the representative Plaintiffs, like all Class members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Volkswagen, which was equipped with a defeat device designed, manufactured and supplied by Bosch.  The representative Plaintiffs, like all Class members, have been damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the Class Vehicles.  Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

**Adequate Representation**

216.    Plaintiffs are members of the Nationwide and State Classes and will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained, and this Court has appointed, counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products generally, and defective automobile systems and parts specifically.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Predominance of Common Questions**

217.    There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members.  The answers to these common questions will advance the adjudication or resolution of the litigation as to all Class members.  These common legal and factual questions include:

a.    whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream, of commerce in the United States;

b.    whether the Class Vehicles contained a defeat device and emitted unlawful levels of pollutants under normal operation;

c.    whether Defendants knew or should have known about the defeat device and emission levels in the Class Vehicles;

d.    whether the true nature of the Class Vehicles' performance, emissions levels, fuel economy, and the inclusion of the defeat device constitute material facts that reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

e.    whether Class members overpaid for their Class Vehicles;

f.    whether Defendants made material misrepresentations regarding the Class Vehicles;

g.    whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

h.    whether Defendants omitted, actively concealed and/or failed to disclose material facts about the Class Vehicles;

i.      whether Defendants concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to their detriment by purchasing and/or leasing the Class Vehicles;

j.      whether the Class Vehicles can be made to comply with EPA and state emission standard without substantially degrading their performance and/or efficiency;

k.      whether Bosch supplied the defeat devise to Volkswagen with the knowledge that Volkswagen would use them in production of Class Vehicles;

l.      whether Bosch knew that using the defeat devices in production Class Vehicles constituted criminal activity in violation of both state and federal laws;

m.      whether Bosch acted in concert with Volkswagen and aided and abetted Volkswagen's fraud;

n.      whether Defendants' conduct violated RICO, the MMWA, consumer protection statutes, warranty laws, and other laws as alleged herein;

o.      whether Plaintiffs and Class members are entitled to a declaratory judgment;

p.      whether Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

q.      whether Plaintiffs and Class members are entitled to damages and other monetary relief, and, if so, in what amount.

### Superiority

218.    Defendants' scheme treated consumers as a Class to be uniformly deceived.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs and Class members have all suffered and will continue to suffer economic harm and damage as a result of Defendants' unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

219.    Defendants have acted in a uniform manner with respect to the Plaintiffs and Class members.  Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the

relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue Without effective remedy.

220.    Class treatment in this Court, as a court with original jurisdiction over the Class claims and as an MDL Transferee Court under 28 U.S. § 1407, will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication by providing common answers to the common questions of knowledge, conduct, duty and breach, that predominate in this action.

221.    Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests.  Classwide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Class Vehicles.

### CLAIMS FOR RELIEF

### FEDERAL CLAIMS

### FEDERAL COUNT I:
### Violation of 18 U.S.C. § 1962(c)-(d)
### The Racketeer Influenced And Corrupt Organizations Act ("RICO")

222.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

223.    Plaintiffs bring this Count on behalf of the Nationwide Class against the following Defendants:  VW AG, Audi AG, Porsche AG, Winterkorn, Müller, Horn, Stadler, and Bosch (inclusively, for purpose of this Count, the "RICO Defendants").

224.   Volkswagen conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity.  Bosch also conducts its business, both legitimate and illegitimate, through hundreds of subsidiaries and affiliates.99  At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

225.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. §1962(c).

226.   Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  See 18 U.S.C. §1962(d).

227.   For many years, the RICO Defendants aggressively sought to increase their sales of the Class Vehicles in an effort to bolster their revenues, augment profits, and increase their market share of the diesel vehicle market.  Finding it impossible to achieve their ambitious goals lawfully, however, the RICO Defendants resorted to cheating through their fraudulent scheme and conspiracy.  The illegal scheme was hatched overseas by VW AG, Audi AG, and/or Porsche AG ("the German Volkswagen Defendants"), brought to U.S. shores by and through the vehicles of VW America, Audi America, and Porsche America (collectively, the "American Volkswagen Defendants"), and executed with the complicity of Bosch.  In particular, the RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "Defeat Device RICO Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Class Vehicles were compliant with emission standards, "clean," and "environmentally friendly" so as to increase revenues and minimize losses from the design, manufacture, distribution and sale of the Class Vehicles and the defeat devices installed therein.  As a direct result of their fraudulent scheme and common course of conduct,

Defendants were able to extract revenues of billions of dollars from Plaintiffs and the Class.  As explained in detail below, the RICO Defendants' misconduct violated Sections 1962(c) and (d).

### A.     Description of the Defeat Device RICO Enterprise

228.    In an effort to expand its global reach, market share, and standardized marketing and sales in the U.S., VW AG, a publicly-traded German company, formed VW America, a separate New Jersey company, which is headquartered in Virginia.  VW America is not publicly traded and thus has no SEC reporting obligations, but it does have reporting obligations, protections and responsibilities unique to the State of New Jersey.  VW AG also controls Audi AG and Porsche AG which, in turn, formed separate U.S. subsidiaries that are not publicly traded – Audi America and Porsche America, respectively – to market and sell the Class Vehicles throughout the U.S. At all relevant times, VW AG maintained tight control over the design, manufacture, and testing of the Class Vehicles.

229.    At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Class Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to import and sell the Class Vehicles containing the defeat device throughout the U.S., and through which they conducted a pattern of racketeering activity under 18 U.S.C. §1961(4).

230.    Alternatively, each of the American Volkswagen Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. §1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in the U.S.  Specifically, VW America is the entity through which Volkswagen applied for, and obtained, the EPA COCs for the VW- and Audi-branded Class Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the U.S. stream of commerce.  Similarly, Porsche America is the entity through which Volkswagen applied for, and obtained, the EPA COCs for the Porsche-branded Class Vehicles with material misrepresentations and omissions about their

specifications in order to introduce them into the U.S. stream of commerce.  And, on information and belief, the German Volkswagen Defendants and Individual Volkswagen Defendants (Winterkorn, Müller, Horn, and Stadler) used each of the American Volkswagen Defendants to distribute and sell the illegal Class Vehicles throughout the U.S.  Finally, Bosch participated, either directly or indirectly, in the conduct of the enterprise's affairs by customizing and supplying components for the defeat devices.  The American Volkswagen Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the RICO Defendants and their co-conspirators.  The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "Defeat Device RICO Enterprise."

231.    At all relevant times, the Defeat Device RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' profit-making scheme.

232.    On information and belief, the association-in-fact Defeat Device RICO Enterprise consisted of the following entities and individuals.

### 1.      The Volkswagen Entity Defendants

233.    Each Volkswagen Entity Defendant is a distinct legal entity, but they are all controlled (directly or indirectly) by Defendant VW AG.  Specifically, Audi AG is a majority-owned subsidiary of VW AG.  Audi America is also a subsidiary of VW AG.  Porsche AG is a wholly-owned subsidiary of VW AG, and Porsche America is, in turn, a wholly-owned subsidiary of Porsche AG.

234.    As noted previously, in 2007, the Volkswagen RICO Defendants made it their mission to become the dominant automotive manufacturing conglomerate in the world.  At the time they articulated this goal, however, Volkswagen was struggling to retain its foothold in the U.S. market.  The strategy of wooing customers with premium products was not paying off, and VW America's costly plant in Chattanooga, Tennessee was "woefully underutilized."  (See Anton

Watts, VW Drama:  *Why Piech Wants Winterkorn Out and What the Future May Hold*, Car and Driver (Apr. 16, 2015)).

235.    In response to these obstacles, VW AG and its leader at the time, Defendant Winterkorn, set in motion an ambitious plan to triple Volkswagen's sales in the U.S.  The linchpin of this strategy was increasing sales of "diesel-powered cars . . . [and] promising high mileage and low emissions without sacrificing performance."  (See Danny Kim, Aaron Danny Hakim, Aaron Kessler, and Jack Ewing, "*As Volkswagen Pushed to be No. 1, Ambitions Fueled a Scandal*," New York times (Sept. 26, 2015).

236.    Additionally, to achieve their lofty sales goals, the Volkswagen RICO Defendants made a business-driven decision to move away from the original selective catalytic reduction ("SCR") emission control systems they had previously used in their vehicles and focused instead on a less expensive and easier to maintain lean NOX trap system.  (Note: The term "NOx trap" refers to any device whose purpose is to reduce the oxides of nitrogen.  However, the term here is used as a shorthand, informal reference to the emissions control system developed by the Volkswagen Defendants as an alternative to the SCR system.  Unlike the NOx trap, SCR systems require vehicles to carry an onboard tank of an exhaust additive, often urea crystals, in mineralized water that has to be refilled every 10,000 miles at a cost of around $300.  Additionally, SCR systems also increase the vehicles' initial purchase price.).  Critically, however, the NOX trap technology that the Volkswagen RICO Defendants implemented could not effectively reduce the Class Vehicles' toxic NOX emissions to lawful levels under normal operating conditions.

237.    Accordingly, working with the other members of the Defeat Device RICO Enterprise, including Bosch, the Volkswagen RICO Defendants devised a scheme to illegally circumvent the U.S.'s stringent emissions standards by incorporating a "defeat device" into the Class Vehicles' Electronic Diesel Control Units.  Employing this technology, Defendants fraudulently obtained COCs (and EOs) for the Class Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions.

238.    Moreover, in order to profit from the scheme and increase their sales according to plan, the Volkswagen RICO Defendants falsely marketed the Class Vehicles as not only compliant but "*clean*" and "*environmentally friendly*" vehicles.  (See Jad Mouawad & Sidney Ember, *VW's Pitch to Americans Relied on Fun and Fantasy*, New York Times (Sept. 27, 2016)).

239.    In sum, as part of their effort to become the dominant automotive manufacturing conglomerate in the world, the Volkswagen RICO Defendants controlled and directed an eight-year-long enterprise with the common purpose of deceiving regulators and the public through lies and deception to increase their market shares and profits, and minimize losses.

### 2.    The Volkswagen Entity Defendants' Directors, Officers, and Engineers

240.    Volkswagen's leaders—including the Individual Defendants (Winterkorn, Müller, Horn, and Stadler) and their unnamed co-conspirators—Ulrich Hackenberg ("Hackenberg"), Frank Tuch ("Tuch"), Wolfgang Hatz ("Hatz"), Scott Keogh ("Keogh"), and Detlev von Platen ("von Platen")—played pivotal roles in the Defeat Device RICO Enterprise's unlawful scheme, common course of conduct, and conspiracy.

### a.    Martin Winterkorn

241.    Defendant Winterkorn took the helm of VW AG in 2007 and was the chief architect of Volkswagen's strategy to triple sales in the U.S. market by relying more heavily on "clean" diesel vehicles.  (See Volkswagen AG, TDI:  U.S. Market Success, Clean Diesel Delivers (March, 2015)).

242.    Winterkorn quickly realized his strategy could not succeed if Volkswagen relied on the same SCR technology that they had used up until then.  Winterkorn instead advocated an alternative course of action that enabled Volkswagen to cut costs and offer the public lower-priced diesel vehicles.  To that end, he appointed Hackenberg and Hatz, two former Audi engineers and unnamed co-conspiring members of the Defeat Device RICO Enterprise, to lead the research and development facet of the "clean" diesel project.

243.    Nevertheless, despite Hackenberg and Hatz's efforts, the technological hurdles were too formidable, and a lawful alternative could not apparently be found.  Although Defendant Winterkorn was routinely apprised of these obvious technical setbacks, he continued to pursue the aggressive cost-cutting, profit driven plan he had originally envisioned. In so doing, he set into motion the fraudulent scheme to defraud regulators and consumers.

244.    On information and belief, Winterkorn knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state emission standards.

### b.    Matthias Müller

245.    Defendant Müller has worked at Volkswagen for nearly his entire life, starting as an Audi toolmaker and climbing the corporate ladder to become VW's Head of Product Management in 2007, and later, became the CEO of Porsche AG in October 2010.  As CEO of Porsche AG, Müller was a trusted "longtime lieutenant of Mr. Winterkorn," (see Danny Hakim and Jack Ewing, Matthias Müller, in the Driver's Seat at Volkswagen, New York Times (Oct. 1, 2015)) and grew sales and profits at Porsche AG dramatically.

246.    During Müller's reign over Porsche AG, he oversaw the release of the Porsche Cayenne Diesels discovery by the EPA to be equipped with defeat devices.

247.    Further, after the revelation of Volkswagen's fraud, Müller was appointed CEO of VW AG on September 25, 2015.  He is suspected to be a protégé of VW AG's former CEO Ferdinand Piëch, whom some blame for propagating the Volkswagen culture that ultimately led to the defeat device conspiracy alleged herein.  (See Victor Luckerson, 5 things to know about Volkswagen's new CEO Matthias Müller, Fortune (Sept. 25, 2015)).

248.    On information and belief, Müller knew or recklessly disregarded that the Class Vehicles utilized defeat devices to evade federal and state vehicle emissions standards.

### c.    Michael Horn

249.    On January 1, 2014, Defendant Horn became CEO and President of VW America after 23 years working at Volkswagen in various sales leadership positions.  Defendant Horn was

tasked with continuing Winterkorn's aggressive ambitions to reach 800,000 in U.S. sales by 2018. As part of his position, Defendant Horn oversaw VW America emissions labs, regulatory compliance efforts, and development of new vehicles.

250.    As alleged above, Defendant Horn admitted to Volkswagen's intentional use of defeat devices to overcome state and federal regulation.

251.    Moreover, Defendant Horn admittedly knew about Volkswagen's use of defeat devices at least as early as 2014, and also knew (and concealed) the existence of defeat devices in Class Vehicles when Volkswagen initiated a recall in December 2014 to purportedly update emission control software in the Class Vehicles without notifying regulators, or the Class, about the use of the illegal defeat devices.

### d.    Rupert Stadler

252.    In 1990, Defendant Stadler joined Audi AG, assuming various roles in Audi and VW as he ascended the ranks at Volkswagen.  On January 1, 2010, he was appointed CEO of Audi AG, which he remains to present day.  As the CEO of Audi AG, Stadler was tasked with implementing Winterkorn's lofty growth goals, as well as overseeing unnamed co-conspirators Hatz and Hackenberg's development of the "clean" diesel engines in Audi vehicles.

253.    Though presumed by many to be Winterkorn's heir apparent, the revelation of Volkswagen's emissions and Audi's extensive involvement in the conspiracy caused Stadler to be passed over for the position of VW AG CEO in favor of Matthias Müller.  (See Audi CEO Rupert Stadler to continue with his post, The Economic Times (Sept. 25, 2015)).

254.    On information and belief, Stadler knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state vehicle emissions standards.

### e.    Scott Keogh

255.    Since June 2012, unnamed co-conspirator Keogh has served as President of Audi America, after a six period as the Chief Marketing Officer of Audi America.  His primary missions

was "rallying the company's internal and external constituencies to focus on Audi goals for further expansion in the U.S. market," as promulgated by Winterkorn.

256.    After the revelation of Volkswagen's fraud, Keogh publicly apologized for Audi America's involvement in the defeat device scandal (see Michael Walker, *L.A. Auto Show: VW, Porsche, Audi Execs Address Diesel Emissions Scandal*, The Hollywood Reporter (Nov. 20, 2015)) and agreed to return "Green Car of the Year" awards, (see Jackie Wattles, Volkswagen stripped of two 'Green Car of the Year' titles, CNN Money (Oct. 1, 2015))  though he continues to tout the future of Audi diesel vehicles in the U.S.  (See Mike Duff, *Audi Chief Thinks Diesel Has a Future in the U.S.*, Car and Driver (Jan. 19, 2016)).

257.    On information and belief, Keogh knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state vehicle emissions standards.

### f.    Detlev von Platen

258.    In 1997, unnamed co-conspirator von Platen joined Porsche AG, managing the Porsche brand in France.  Over the following decade, von Platen climbed the ranks at Porsche to assume the position of President and CEO of Porsche America on April 1, 2008.

259.    As President and CEO of Porsche America, von Platen was charged with implementing Winterkorn's vision for the Porsche brand in the U.S., as he had oversight "responsibility for the importation and distribution of Porsche cars in North America."  (See *President and Chief Executive Officer – PCNA, Inc.*, Porsche Cars North America).    Porsche America was expected to contribute to Winterkorn's lofty sales goals, bolstered by the introduction of "clean" diesel engines for the Porsche Cayenne and increasing sales from 26,035 to a record 47,007 sales in 2014.

260.    On November 1, 2015, as part of a management shakeup in the wake of Volkswagen's diesel scandal, von Platen left his position at Porsche America to become a member of the Executive Board for Sales and Marketing at Porsche AG.

261. On information and belief, von Platen knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state vehicle emissions standards.

### g.     Ulrich Hackenberg

262. On February 1, 2007, unnamed co-conspirator Hackenberg was appointed to Volkswagen's Brand Board of Development.  In this capacity, he was responsible for the technical development of all of the Volkswagen Defendant's brands.

263. On July 1, 2013, Hackenberg was appointed to the Board of Management of Audi AG and made responsible for its Technical Development department.   In this capacity, Hackenberg spearheaded the development of Audi's TDI "CleanDiesel" engines, which ultimately contained the illegal defeat devices at issue in this case.  As he explained in a press release, Hackenberg's strategy for Audi's technical development included the following:

> [P]ushing forward with development in . . . our TDI engines in the USA -- our clean diesel offensive is bearing substantial fruit. In China, too, we are already introducing the first clean diesel models and watching developments there very closely. We also expect a great deal from g-tron technology, the most sustainable type of gas drive.  (See "Gentlemen Start Your Engines").

Hackenberg's statement is illustrative of the Volkswagen Defendants' efforts to falsely bill Class Vehicles as "clean," "environmentally friendly," and "fuel efficient" when the opposite was true.

### h.     Frank Tuch

264. In 2010, unnamed co-conspirator Tuch was appointed head of quality control across the various Volkswagen Defendants' brands.  Defendant Winterkorn hoped Tuch would bring the Volkswagen Defendants "forward in the USA."   Volkswagen's in-house magazine reported that Tuch and Winterkorn worked closely to honor that pledge, meeting "every Monday to discuss quality issues, often taking test drives in vehicles manufactured by the company."  In his role as head of quality assurance, Tuch was also intimately familiar with Volkswagen, Audi, and Porsche engines and transmissions. Among his duties was "the development and production

of components such as engines, transmissions, seats and suspension parts" for small, compact, midsize, and full size product lines, including all the Class Vehicles.  (See Jack Ewing, "Volkswagen Suspends 5th Executive in Emissions Scandal," The New York Times (Oct. 20, 2015)).

265.    Significantly, Tuch also oversaw "36 laboratory locations throughout the world in terms of training and auditing and also finds staff to fill laboratory manager positions," including the Volkswagen Defendants' laboratories in the United States, which were primarily responsible for emissions testing of the Class Vehicles.

266.    On information and belief, Tuch knew or recklessly disregarded that the Class Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### i.      Wolfgang Hatz

267.    Unnamed co-conspirator Hatz directed engine development for the Porsche, Audi and Volkswagen brands.  In this role, he supervised the development of the engines and transmissions for the Class Vehicles issue and had intimate knowledge of their technical details.

268.    On information and belief, Hatz knew or recklessly disregarded that the Class Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### 3.      The Bosch Defendants

269.    As explained above, Bosch developed EDC Unit 17, the emissions control system and software that provided the basis for the defeat device, and sold it to Volkswagen.

270.    Defendant Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that Volkswagen used as defeat devices.  Denner fostered Bosch's relationship with key corporate partners, such as Volkswagen, which brought in billions of dollars in annual revenue for Bosch.

271.    Using EDC Unit 17, Bosch worked with Volkswagen to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations.  To

that end, Bosch and Volkswagen equipped EDC Unit 17 in the Class Vehicles with unique software code to detect when it was undergoing emissions testing, as described above.

272.   Bosch was well aware that the EDC Unit 17 could be, and indeed was, used by Volkswagen to cheat on emissions testing.  Indeed, Bosch, seeking to absolve itself of liability, sent a letter to Volkswagen AG in 2007, stating that Class Vehicles *could not be lawfully operated* if the emissions controls were disabled.

273.   Indeed, notwithstanding their knowledge that the Class Vehicles *could not be lawfully operated* if the emissions controls were disabled, Bosch, cementing their position as a leading supplier of diesel emissions equipment, continued to sell approximately *eleven million* EDC Unit 17s to Volkswagen over an eight year period.

274.   Bosch's continued sale of EDC Unit 17 to the Volkswagen Defendants is remarkable considering that:

> a.   Bosch manufactured, tested and sold EDC Unit 17 emissions control systems to various other diesel vehicle manufacturers, *none* of which was modified with a defeat device software that allowed vehicles to automatically activate or disable the emissions control systems depending on operating conditions.  Bosch could not plausibly believe that the "defeat device" on the Class Vehicles was necessary for any legitimate purpose;

> b.   None of the varied emissions control systems that Bosch tested, manufactured and sold to other diesel vehicle manufacturers relied on the same NOX trap technology that Volkswagen was utilizing. Indeed, Volkswagen's competitors, including reputable and technologically-sophisticated brands like Mercedes-Benz and BMW, continued using the more expensive SCR technology; and

> c.   Absent extraordinary engineering breakthroughs, the EDC Unit 17 presented a practical impossibility.

275.   Bosch (including Denner) knew or recklessly disregarded that Volkswagen had *not* actually engineered a revolutionary alternative to the SCR systems that enabled the Class Vehicles to maintain their performance, fuel efficiency, reduce emissions, *and* reduce costs. Instead, Bosch knew or recklessly disregarded that the Class Vehicles utilized Bosh's component parts as defeat devices in order to evade federal and state vehicle emissions standards.

**B.      The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

276.     The Defeat Device RICO Enterprise began approximately in 2007, with VW AG's decision to produce the illegal Class Vehicles. The Defeat Device RICO Enterprise continued without interruption for eight years, as Volkswagen continued to install Bosch EDC Unit 17's in the Class Vehicles.  It was not until September 2015 that the Defeat Device RICO  Enterprise began to unravel, when U.S. regulators finally uncovered the fraudulent scheme.

277.     At all relevant times, the Defeat Device RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Volkswagen Defendants, their network of dealerships, the Individual Defendants, Bosch, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Vehicles to Plaintiffs and the Nationwide Class through fraudulent COCs, false emissions tests, deceptive and misleading sales tactics and materials, and deriving profits and revenues from those activities.  Each member of the Defeat Device RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide.

278.     The Defeat Device RICO Enterprise functioned by selling vehicles to the consuming public.  Many of these products are legitimate, including vehicles that do not contain defeat devices.  However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

279.     The Defeat Device RICO Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state

boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the sale of the same.

280.    Within the Defeat Device RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The Defeat Device RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

281.    Each participant in the Defeat Device RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the Defeat Device RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

282.    The RICO Defendants participated in the operation and management of the Defeat Device RICO Enterprise by directing its affairs, as described herein.  While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

283.    The Volkswagen RICO Defendants exerted substantial control over the Defeat Device RICO Enterprise, and participated in the affairs of the Defeat Device RICO Enterprise by:

    a.    transitioning their diesel vehicle design away from an effective SCR emissions control system and adopt instead the ineffective NOX trap technology that generates high levels of toxic pollutants;

    b.    designing the Class Vehicles with defeat devices;

    c.    failing to correct or disable the defeat devices when warned;

    d.    manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

    e.    misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC applications;

f.      introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC;

g.      concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

h.      persisting in the manufacturing, distribution, and sale of the Class Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

i.      misleading government regulators as to the nature of the defeat devices and the defects in the Class Vehicles;

j.      misleading the driving public as to the nature of the defeat devices and the defects in the Class Vehicles;

k.      designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

l.      otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

m.      illegally selling and/or distributing the Class Vehicles;

n.      collecting revenues and profits from the sale of such products; and

o.      ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

284.    Bosch also participated in, operated and/or directed the Defeat Device RICO Enterprise. Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 to include a "defeat device" in the Class Vehicles. Additionally, Bosch continuously cooperated with the Volkswagen Defendants to ensure EDC Unit 17 was fully integrated into the Class Vehicles.  Finally, Bosch participated by concealing the truth about the Class Vehicles and collecting the revenues and profits from the same.

285.    Without the RICO Defendants' willing participation, including Bosch's provision of the component parts for the defeat devices contained in the Class Vehicles, the Defeat Device RICO Enterprise's scheme and common course of conduct would not have been successful.

286.     The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

C.     **Mail and Wire Fraud**

287.     To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the Defeat Device RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Defeat Device RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and §1343 (wire fraud).

288.     Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years.  The multiple acts of racketeering activity which the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Defeat Device RICO Enterprise.  The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

289.     The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

290.     In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or

fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

291.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

a.    <u>Mail Fraud:</u>  The RICO Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

b.    <u>Wire Fraud:</u>  The RICO Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

292.    The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a.    the Class Vehicles themselves;

b.    component parts for the defeat devices;

c.    essential hardware for the Class Vehicles;

d.    falsified emission tests;

e.    fraudulent applications for EPA COCs and CARB EOs;

f.    fraudulently-obtained EPA COCs and CARB EOs;

g.    vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

h.    documents and communications that facilitated the falsified emission tests;

i.    false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

j.    sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Class Vehicles;

k.    documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

l.    documents to process and receive payment  for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

m.    payments to Bosch;

n.    millions of dollars in compensation to the Individual Defendants;

o.    deposits of proceeds; and

p.    other  documents and things, including electronic communications.

293.    Based on information and belief, the RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Class Vehicles and related documents by mail or a private  carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| VW America Manufacturing Plant | South Bay VW | October, 2011 | Shipment of Volkswagen Jetta TDI Class Vehicles |
| CARB | VW America | July, 2014 | Mailed EO for 2015 Class Vehicles based on fraudulent application |
| Massachusetts Department of Transportation | Gregory Gotta | August, 2014 | Mailed certificate of registration for 2014 Porsche Cayenne Diesel based on false emission test due to concealed defeat device |
| California Department of Motor Vehicles | Phillip Clark | December, 2014 | Mailed registration card for 2014 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |
| California Department of Motor Vehicles | Caroline Hoag | December, 2014 | Mailed renewed registration for 2011 Jetta SportWagen TDI based on false emission test due to concealed defeat device |
| Washington State Department of Licensing | Dan Clements | February, 2015 | Mailed registration certified for 2012 Volkswagen Touareg TDI based on false emission test due to concealed defeat device |

| California Department of Motor Vehicles | Susan Shalit | January, 2015 | Mailed registration card for 2015 Volkswagen Golf TDI based on false emission test due to concealed defeat device |
| California Department of Motor Vehicles | Lena Brook | March, 2015 | Mailed validated vehicle registration for 2015 Audi Q5 TDI based on false emission test due to concealed defeat device |

294.    Based on information and belief, the RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
| --- | --- | --- | --- |
| Pignataro Volkswagen, Washington | American express, North Carolina | April, 2012 | Credit card transaction in the amount of $5,000 for down payment on 2012 VW Touareg by Dan Clements |
| CARB, California | VW America, Virginia | May, 2014 | Email communications concerning WVU study |
| VW America, Michigan | EPA, Michigan; CARB, California | May, 2012 | Misleading application(s) for COC and EO for 2013 VW Passat TDI |
| VW America, Michigan | EPA, Michigan; CARB, California | January, 2013 | Misleading application(s) for COCs and EOs for 2014 Audi A6, A7, A8L, A8 and Q5 |
| Porsche America, Atlanta | EPA, Michigan; CARB, California | April, 2013 | Misleading application(s) for COC and EO for 2014 Porsche Cayenne Diesel |
| VW America, Virginia | CARB, California | October, 2014 | Misleading communications about discrepancies identified in WVU study |
| Audi of Lynnbrook, New York | American Express, North Carolina | December, 2014 | Credit card transaction in the amount of $2,586.45 for down payment on lease of 2015 Audi A3 by Kevin and Elizabeth Bedard |
| VW America, Virginia | EPA, District of Columbia | December, 2014 | Misleading communications about software patch for the Class Vehicles without revealing fact of the defeat device |

295.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.  Specifically, the American Volkswagen Defendants, under the direction and control of the German Volkswagen and Individual Volkswagen Defendants, made misrepresentations about the Class Vehicles on their

websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

296.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

297.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars.

298.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

299.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d), the RICO Defendants conspired to violate 18 U.S.C. §1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

300.    The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses.

301.    To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the defect even after regulators raised concerns.  The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Class Vehicles.

302.    The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

303.    Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

304.    The RICO Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them and the American Volkswagen Defendants about the Class Vehicles.  The RICO Defendants knew and intended that consumers would incur costs as a result.  As fully alleged herein, Plaintiffs, along with hundreds of thousands of other consumers, relied upon Defendants' representations and omissions that were made or caused by them.  Plaintiffs' reliance is made obvious by the fact that they purchased illegal vehicles that never should have been introduced into the U.S. stream of commerce and whose worth has now plummeted since the scheme was revealed.  In addition, the EPA and regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise Volkswagen could not have obtained valid COCs and EOs to sell the Class Vehicles.

305.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from

Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

306.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Defeat Device RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

307.    During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared technical, marketing, and financial information that revealed the existence of the defeat devices contained therein. Nevertheless, the RICO Defendants shared and disseminated information that deliberately misrepresented the Class Vehicles as legal, "clean," "environmentally friendly," and "fuel efficient."

308.    By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

      a.      Purchase or lease of an illegal, defective Class Vehicle;

      b.      Overpayment for a Class Vehicle, in that Plaintiffs and Class members believed they were paying for a vehicle that met certain emission and fuel efficiency standards and obtained a vehicle that was anything but;

      c.      The value of the Class Vehicles has diminished, thus reducing their resale value;

      d.      Other out-of-pocket and loss-of-use expenses;

      e.      Payment for alternative transportation; and

      f.      Loss of employment due to lack of transportation.

309.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**FEDERAL COUNT II:**
**Violation of 15 U.S.C. §§ 2301, *et seq.*,**
**The Magnuson-Moss Warranty Act ("MMWA")**

310.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

311.    Plaintiffs bring this Count on behalf of the Nationwide Class and against the following Defendants: VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

312.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

313.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

314.    The VW Entity Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

315.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

316.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

317.    The VW Entity Defendants' provided Plaintiffs and the Nationwide Class with the following two express warranties, which are covered under 15 U.S.C. § 2301(6):

a.    **Manufacturer's Warranty**—This written warranty provides "bumper-to-bumper" limited express warranty coverage for a minimum of 3 years or 36,000 miles, whichever comes first. The warranty covers emissions related repairs.

105

b.   **Federal Emissions Warranty**—Consistent with federal law, the Volkswagen Defendants provided a "performance warranty" and a "design and defect warranty."  In the event that a vehicle fails an emissions test, these warranties cover the repair and replacement of: all emission control and emission-related parts for two years or 24,000 miles (whichever comes first); and specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on–board emissions diagnostic device or computer for 8 years or 0,000 miles (whichever comes first).

318.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

319.   The VW Entity Defendants breached these warranties as described in more detail above.  Without limitation, the Class Vehicles share a common design defect in that they emit more pollutants than (a) is allowable under the applicable regulations and (b) the VW Entity defendants repeatedly represented were emitted to their customers, the public, and regulators. The VW Entity Defendants have admitted that the Class Vehicles are illegal, defective and of lesser quality than advertised.

320.   Plaintiffs and members of the Nationwide Class have had sufficient direct dealings with the VW Entity Defendants or their agents (dealerships) to establish privity of contract between the VW Entity Defendants, on the one hand, and Plaintiffs and other Class members, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the VW Entity Defendants or their dealers, and of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

321.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile.  At the time of sale or lease of each Class Vehicle, the Volkswagen Defendants knew of the misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Indeed, the VW Entity Defendants' quest for remedies has been

106

unsuccessful to date.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs or Class members resort to an informal dispute resolution procedure and/or afford the VW Entity Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

322.    Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to the VW Entity Defendants.  Because the VW Entity Defendants are refusing to acknowledge any revocation of acceptance and have not immediately returned any payments made, Plaintiffs and the Nationwide Class have not re-accepted their Class Vehicles by retaining them.

323.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial.

## COMMON LAW CLAIMS

### COMMON LAW COUNT I:
### FRAUD

324.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

325.    Plaintiffs bring this Count on behalf of the Nationwide Class or, in the alternative, on behalf of the State Classes, against all Defendants.

326.    As alleged extensively above, Volkswagen intentionally concealed and suppressed material facts concerning the illegality and quality of the Class Vehicles in order to defraud and mislead both regulators and the Class about the true nature of the Class Vehicles.

Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the defeat devices in the Class Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Class Vehicles emitted grossly larger quantities of noxious pollutants and contaminants, up to 40 times the legal limit. The result was precisely what Volkswagen had intended—the Class Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to hundreds of thousands of unwitting American consumers.

327.    Volkswagen valued its profits over the trust that Plaintiffs and other Class members entrusted to it.  As one customer, Priya Shah, put it: "It's just a blatant disregard and intentional manipulation of the system.  That's just a whole other level of not only lying to the government, but also lying to your consumer.  People buy diesel cars from Volkswagen because they feel they are clean diesel cars."  In the words of Ms. Shah, which no doubt reflect the sentiments of other Class members:  "I don't want to be spewing noxious gases into the environment."

328.    Necessarily, Volkswagen also took steps to ensure that its employees and co-conspirators like Bosch, did not reveal the details of its scheme to regulators or consumers, including Plaintiffs and Class members.  Volkswagen did so to falsely assure purchasers and lessors of its vehicles, including previously-owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emission regulations, and that its vehicles likewise comply with applicable laws and regulations.

329.    Volkswagen's false representations and omissions were material to consumers, as they concerned both the legality and core marketing features of the Class Vehicles. As Volkswagen well knew, Plaintiffs and other Class members highly valued that the vehicles they were purchasing or leasing were "clean" diesel cars, and they paid a premium accordingly.

330.    Plaintiffs and Class members reasonably relied on Defendants' deception, and Defendants intended that they would so rely.  Plaintiffs and Class members had no way of

discerning that Defendants were, in fact, deceiving them because the defeat devices were extremely sophisticated technology and could not be discerned by regulators, much less consumers. Plaintiffs and Class members did not, and could not, unravel Defendants' scheme on their own. In fact, it took years before the engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected the discrepancy of the emissions spewed from the Class Vehicles using sophisticated, expensive equipment and applying decades of combined experience. And even then, Volkswagen continued to conceal its fraud until the EPA and CARB applied their collective expertise and leverage.

331. Defendants' devious scheme to design and install defeat device software in the Class Vehicles for the specific purpose of circumventing U.S. law, and then concealing their fraudulent scheme through seven model years, reveals a corporate culture that emphasized sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also public health and Volkswagen's customers, including Plaintiffs and Class members.

332. Defendants had a duty to disclose the defeat devices to regulators and the driving public. That includes Bosch, who had a duty to disclose the scheme, given its knowledge of and complicity in, the design and customization of the defeat devices for the Class Vehicles.

333. Volkswagen hatched the deceptive scheme and knew that its customers, including Plaintiffs and Class members, did not know about (and could not reasonably discover) its scheme.

334. Volkswagen not only concealed the illegal defeat devices, which posed a safety harm, but went further to make affirmative misrepresentations about the quality of the Class Vehicles as "CleanDiesel" vehicles. Having "opened its mouth" to claim the Class Vehicles were "clean," Volkswagen had the duty to come clean about its dirty defeat devices – but it failed to do so.

335. Volkswagen actively concealed the defeat devices and actual emission levels of the Class Vehicles to pad its profits and avoid the perception that the Class Vehicles did not

comply with federal and state laws governing clean air and emissions. Volkswagen engaged in this fraudulent concealment at the expense of Plaintiffs and Class members.

336.    Plaintiffs and Class members were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public know the truth—Volkswagen would not have been able to obtain COCs or EOs for the sale of the Class Vehicles and as a consequence Plaintiffs and Class members would never have purchased or leased the Class Vehicles in the first place.

337.    As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs and Class members sustained damages. They own or lease Class Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, on information and belief, the Class Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

338.    Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs and Class members for the purpose of enriching themselves at Plaintiffs' and Class members' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COMMON LAW COUNT II:
### BREACH OF CONTRACT

339.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

340.    Plaintiffs bring this Count on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

341.    Every purchase or lease of a Class Vehicle from an authorized dealer of the VW Entity Defendants constitutes a contract between the VW Entity Defendants and the purchaser or lessee.  The VW Entity Defendants materially breached these contracts by selling or leasing Plaintiffs and Class members defective, non-compliant Class Vehicles and by misrepresenting or failing to disclose the existence of the "clean" diesel engine system's defeat device, rendering the Vehicles substantially less valuable than the vehicles that the VW Entity Defendants advertised and promised to deliver to Plaintiffs and Class members.

342.    The VW Entity Defendants' misrepresentations and omissions alleged herein, including the VW Entity Defendants' misrepresentation of the clean diesel system and failure to disclose the existence of the defeat, caused Plaintiffs and the other Class members to enter into their agreements to purchase or lease their Class Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and Class members would not have purchased or leased their Class Vehicles, would not have purchased or leased their Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the "clean" diesel engine system and which were not marketed as including such a system. Accordingly, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

343.    The VW Entity Defendants also breached their implied covenant of good faith and fair dealing under the laws of all 50 States and the District of Columbia.  By delivering a vehicle that contained defeat device software and thus exceeded, during normal use, federal and state emission limits—and the VW Entity Defendants' advertised and promised emission levels—by up to 40 times, the VW Entity Defendants' blatantly violated Plaintiffs' and Class members' fair and reasonable expectations under their respective contracts.  In addition, the VW Entity Defendants' misrepresentations and omissions violated Volkswagen's implied duty to deal honestly, and within reasonable commercial standards of fair dealing, with Plaintiffs and Class members.

344.    As a direct and proximate result of the VW Entity Defendants' breach, Plaintiffs and Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COMMON LAW COUNT III:
## UNJUST ENRICHMENT

345.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

346.    Plaintiffs bring this Count on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes against all Defendants.

347.    Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by Volkswagen's concealment of the "defeat device," and Plaintiffs and Class members have overpaid for the vehicles.

348.    Defendants have received and retained unjust benefits from the Plaintiffs and Class members, and inequity has resulted.

349.    It is inequitable and unconscionable for Defendants to retain these benefits.

350.    Because Volkswagen concealed its fraud and deception, Plaintiffs and Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

351.    Defendants knowingly accepted the unjust benefits of its fraudulent conduct.

352.    As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Class members, in an amount to be proven at trial.

## STATE LAW CLAIMS

## ILLINOIS

### ILLINOIS COUNT I:
### VIOLATION OF ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1a)

353.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

354.   Plaintiffs Andrianos, Barwacz, Borz, Bozenda, Briseno, Catoline-Greenwall, Cunningham, Fatlan, Faut, Gilles, Glass, Gordon, Hagenbuch, Hicks, Jamiolowski, Klosa, Martin, Mugge, Mullins, Niebuhr, Pace, Patterson, Prahl, Resendiz, Rose, Savelskas, Sollis, Sztejkowski, Viele, Wagner, and Weber (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Illinois Class against all Defendants.

355.   Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

356.   Plaintiff and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

357.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

358.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.

The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Illinois Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Illinois Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

359.    Defendants thus violated the Act by, at minimum willfully failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system.

360.    Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

361.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Illinois CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

362.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Illinois CFA.

363.    Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

364.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Illinois Class.

365.    Volkswagen knew or should have known that its conduct violated the Illinois CFA.

366.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

367.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

368.    Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Illinois Class.

369.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

370.    Plaintiffs and the Illinois Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Illinois Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

371.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Illinois CFA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

372.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

373.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and the Illinois Class have suffered injury-in-fact and/or actual damage.

374.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Class seek monetary relief against Volkswagen in the amount of actual damages, as well as punitive damages because Volkswagen acted with fraud and/or malice and/or was grossly negligent.

375.    Plaintiffs also seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

## ILLINOIS COUNT II:

### BREACH OF EXPRESS WARRANTY
### (810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)

376.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

377.    Plaintiffs bring this Count on behalf of the Illinois Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

378.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

379.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

380.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

381.    In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

382.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

383.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

384.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

385.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

386.    The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Illinois Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

387.    Plaintiffs and the Illinois Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Illinois Class members that the Class Vehicles were intentionally designed and manufactured

to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

388.    The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

389.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

390.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

391.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

392.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Illinois Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

393.    Accordingly, recovery by Plaintiffs and the other Illinois Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Illinois Class members, seek all remedies as allowed by law.

394.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Illinois Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

395.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Illinois Class members' remedies would be insufficient to make Plaintiffs and the other Illinois Class members whole.

396.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Illinois Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Illinois Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

397.    The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

398.     As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Illinois Class members have been damaged in an amount to be determined at trial.

## ILLINOIS COUNT III:

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)

399.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

400.     Plaintiffs bring this Count on behalf of the Illinois Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

401.     The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

402.     With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

403.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

404.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

405.     These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

406.    Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

407.    As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Illinois Class members have been damaged in an amount to be proven at trial.

## MINNESOTA

### MINNESOTA COUNT I:
### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (Minn. Stat. § 325f.68, *et seq.*)

408.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

409.    Plaintiff Mattson (for the purpose of this section, "Plaintiffs") brings this action on behalf of themselves and the Minnesota Class against all Defendants.

410.    The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

411.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1). Volkswagen participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

412.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit

grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Minnesota Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Minnesota Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

413.   Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

414.   Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

415.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

416.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Minnesota CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

417.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Minnesota CFA.

418.    Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

419.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Minnesota Class.

420.    Volkswagen knew or should have known that its conduct violated the Minnesota CFA.

421.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

      a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

      b.      intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

      c.      made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

124

422.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

423.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Minnesota Class.

424.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

425.    Plaintiffs and the Minnesota Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Minnesota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or— if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

426.    Volkswagen had an ongoing duty to all Volkswagen and Audi customers to refrain from unfair and deceptive practices under the Minnesota CFA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

427. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

428. As a direct and proximate result of Defendants' violations of the Minnesota CFA, Plaintiffs and the Minnesota Class have suffered injury-in-fact and/or actual damage.

429. Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

430. Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Volkswagen's acts show deliberate disregard for the rights or safety of others.

**MINNESOTA COUNT II:**

**VIOLATION OF MINNESOTA UNIFORM
DECEPTIVE TRADE PRACTICES ACT
(Minn. Stat. § 325d.43-48, *et seq.*)**

431. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

432. This claim is brought on behalf of the Minnesota Class against all Defendants.

433. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. In the course of the Volkswagen's business, it engaged in deceptive practices by representing that Class Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; representing that Class Vehicles are of a particular standard, quality, or grade,

or that goods are of a particular style or model, if they are of another; and advertising Class Vehicles with intent not to sell them as advertised. Volkswagen participated in misleading, false, or deceptive acts that violated the Minnesota DTPA.

434.    By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices prohibited by the Minnesota DTPA.

435.    Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

436.    In the course of its business, Volkswagen willfully failed to disclose and actively concealed the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

437.    Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

438.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Minnesota DTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

439.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Minnesota DTPA.

440.    Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

441.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Minnesota Class.

442.    Volkswagen knew or should have known that its conduct violated the Minnesota DTPA.

443.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

444.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the

defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

445.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Minnesota Class.

446.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

447.    Plaintiffs and the Minnesota Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Minnesota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or— if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.  Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

448.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Minnesota DTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

449.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

450.     As a direct and proximate result of Defendants' violations of the Minnesota DTPA, Plaintiffs and the Minnesota Class have suffered injury-in-fact and/or actual damage.

451.     Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

452.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that Volkswagen's acts show deliberate disregard for the rights or safety of others.

### MINNESOTA COUNT III:

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Minn. Stat. §§ 336.2-314 and 336.2A-212)

453.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

454.     Plaintiffs bring this Count on behalf of the Minnesota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

455.     The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

456.     With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

457.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

458.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

459.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

460.    Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

462.    As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Minnesota Class members have been damaged in an amount to be proven at trial.

## MINNESOTA COUNT IV:

### BREACH OF EXPRESS WARRANTY
### (Minn. Stat. §§ 336.2-313 and 336.2A-210)

462.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

463.    Plaintiffs bring this Count on behalf of the Minnesota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

464.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

465.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

466.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

467.    In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

468.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

469.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

470.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

471.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

472.    The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Minnesota Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

473.    Plaintiffs and the Minnesota Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Minnesota Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

474.    The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

475.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

476.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

477.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

478.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Minnesota Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

479.    Accordingly, recovery by Plaintiffs and the other Minnesota Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Minnesota Class members, seek all remedies as allowed by law.

480.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Minnesota Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

481.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Minnesota Class members' remedies would be insufficient to make Plaintiffs and the other Minnesota Class members whole.

482.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Minnesota Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Minnesota Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

483.    The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

484.    As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Minnesota Class members have been damaged in an amount to be determined at trial.

## MISSOURI

### MISSOURI COUNT I:
### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, *et seq.*)

485.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

486.    Plaintiffs, Angle-Graves, Forrest and Hloben, (for the purpose of this section, "Plaintiffs") brings this action on behalf of themselves and the Missouri Class against all Defendants.

487.    Volkswagen, Plaintiffs and the Missouri Class are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

488.    Volkswagen engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

489.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation,

unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

490.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Missouri Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Missouri Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

491.    By failing to disclose these defects or facts about the defects described herein known to it or that were available to Volkswagen upon reasonable inquiry, Volkswagen deprived consumers of all material facts about the safety and functionality of their vehicles.  By failing to release material facts about the defect, Volkswagen curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers.  15 Mo. Code of State Reg. § 60-9.110.  Moreover, Volkswagen has otherwise engaged in activities with a tendency or capacity to deceive.  Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

492.    In the course of Volkswagen's business, Volkswagen engaged in misleading, false, unfair or deceptive acts or practices that violated Missouri law by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

493.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates Missouri law.

494.    Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

495.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Missouri Class, including without limitation by failing to disclose the defects in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by Volkswagen about the environmental cleanliness and efficiency of its vehicles.  Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of State Reg. § 60-9.090.

496.    Because Volkswagen knew or believed that its statements regarding environmental cleanliness and efficiency of its vehicles were not in accord with the facts and/or

had no reasonable basis for such statements in light of its knowledge of these defects, Volkswagen engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of State Reg. 60-9.100.

497.    Volkswagen's conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers.  Such acts are unfair practices in violation of 15 Mo. Code of State Reg.  60-8.020.

498.    Volkswagen knew or should have known that its conduct violated the Missouri MPA.

499.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

> a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;
>
> b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or
>
> c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

500.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

501.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Missouri Class.

502.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

503.    Plaintiffs and the Missouri Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Missouri Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

504.    Volkswagen had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Missouri MPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

505.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

506.    As a direct and proximate result of Defendants' violations of the Missouri MPA, Plaintiffs and the Missouri Class have suffered injury-in-fact and/or actual damage.

507.    Volkswagen is liable to Plaintiffs and the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Volkswagen's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## MISSOURI COUNT II:

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mo. Stat. §§ 400.2-314 and 400.2A-212)

508.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

509.    Plaintiffs bring this Count on behalf of the Missouri Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

510.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

511.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

512.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

513.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

514.    Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

515.    As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Missouri Class members have been damaged in an amount to be proven at trial.

## MISSOURI COUNT III:

### BREACH OF EXPRESS WARRANTY
### (Mo. Stat. §§ 400.2-313 and 400.2A-210)

516.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

517.    Plaintiffs bring this Count on behalf of the Missouri Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

518.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

519.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

520.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

521.    In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

522.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

523.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

524.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

525.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

526.    The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Missouri Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

527.    Plaintiffs and the Missouri Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Missouri Class members that the Class Vehicles were intentionally designed and

manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

528.    The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

529.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

530.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

531.    Michael Horn's testimony serves as an admission that the limited warranty promising to  repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

532.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Missouri Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

533.    Accordingly, recovery by Plaintiffs and the other Missouri Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Missouri Class members, seek all remedies as allowed by law.

534.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Missouri Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

535.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Missouri Class members' remedies would be insufficient to make Plaintiffs and the other Missouri Class members whole.

536.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Missouri Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Missouri Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

537.    The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

538.    As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Missouri Class members have been damaged in an amount to be determined at trial.

## SOUTH DAKOTA

### SOUTH DAKOTA COUNT I:
### VIOLATION OF THE SOUTH DAKOTA
### DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (S.D. CODIFIED LAWS § 37-24-6)

539.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

540.    Plaintiff Viele (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Dakota Class against all Defendants.

541.    Volkswagen, Plaintiffs and the South Dakota Class are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

542.    Volkswagen is engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

543.    The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

544.    In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "Clean Diesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class

Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and South Dakota Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and South Dakota Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

545.    Volkswagen thus violated the provisions of the South Dakota CPA, at a minimum by:  (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

546.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the South Dakota CPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

547.    Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

146

548.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the South Dakota CPA.

549.    Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

550.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the South Dakota Class.

551.    Volkswagen knew or should have known that its conduct violated the South Dakota CPA.

552.    Defendants owed Plaintiffs and South Dakota Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

      a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

      b.     intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

      c.     Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

553.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

554.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the South Dakota Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

555.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and South Dakota Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

556.    Plaintiffs and South Dakota Class members were adversely affected and suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the South Dakota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

557.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the South Dakota CPA in the course of its business.

558.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

559.    Pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs and the South Dakota Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief to the extent available under the South Dakota CPA.

## SOUTH DAKOTA COUNT II:

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.D. CODIFIED LAWS §§ 57A-2-314 and 57A-2A-212)

560.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

561.    Plaintiffs bring this Count on behalf of the South Dakota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

562.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

563.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

564.    The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

565.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

566.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

567.    Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

568.    As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other South Dakota Class members have been damaged in an amount to be proven at trial.

## SOUTH DAKOTA COUNT III:

### BREACH OF EXPRESS WARRANTY
### (S.D. CODIFIED LAWS §§ 57A-2-313 and 57A-2A-210)

569.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

570.    Plaintiffs bring this Count on behalf of the South Dakota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

571.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

572.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

573.    The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

574.    In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

575.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

576.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

577.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles,

whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

578.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

579.    The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other South Dakota Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

580.    Plaintiffs and the South Dakota Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and South Dakota Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

581.    The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

582.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

583.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss

in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

584. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

585. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other South Dakota Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

586. Accordingly, recovery by Plaintiffs and the other South Dakota Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other South Dakota Class members, seek all remedies as allowed by law.

587. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other South Dakota Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

588. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other South Dakota

Class members' remedies would be insufficient to make Plaintiffs and the other South Dakota Class members whole.

589.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other South Dakota Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other South Dakota Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

590.    The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

591.    As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other South Dakota Class members have been damaged in an amount to be determined at trial.

## WISCONSIN

### WISCONSIN COUNT I:
### VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### (WIS. STAT. § 100.18)

592.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

593.    Plaintiff Cottral (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wisconsin Class against all Defendants.

594.    Plaintiffs and the Wisconsin Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).  Plaintiffs and Wisconsin Class members purchased or leased one or more Class Vehicles.

595.    Plaintiffs and Wisconsin Class members are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

596.    Volkswagen is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

597.    The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

598.    In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "Clean Diesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Wisconsin Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Wisconsin Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

599.    Volkswagen thus violated the Wisconsin DTPA, at a minimum by making myriad "representation[s] or statement[s] of fact which [are] untrue, deceptive or misleading" concerning the Class Vehicles.

600.    In the course of Volkswagen's business, and in connection with consumer transactions,  Volkswagen engaged in misleading, false, unfair or deceptive acts or practices that violated the Wisconsin DTPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

601.    Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

602.    The Clean Air Act and EPA implementing regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Wisconsin DTPA.

603.    Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently.  Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

604.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Wisconsin Class.

605.    Volkswagen knew or should have known that its conduct violated the Wisconsin DTPA.

606.    Defendants owed Plaintiffs and Wisconsin Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.  intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.  Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

607.  Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

608.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Wisconsin Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

609.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Wisconsin Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

610.  Plaintiffs and Wisconsin Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Wisconsin Class

members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

611.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of its business.

612.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

613.    Plaintiffs and the Wisconsin Class seek damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

### WISCONSIN COUNT II:

### BREACH OF EXPRESS WARRANTY
### (WIS. STAT. §§ 402.313 and 411.210)

614.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

615.    Plaintiffs bring this Count on behalf of the Wisconsin Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

616.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

617.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

618.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

619.    In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

620.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

621.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

622.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

623.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

624.    The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Wisconsin Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

625.    Plaintiffs and the Wisconsin Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Wisconsin Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

626.    The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

627.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

628.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive

629.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

630.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Wisconsin Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

631.    Accordingly, recovery by Plaintiffs and the other Wisconsin Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Wisconsin Class members, seek all remedies as allowed by law.

632.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Wisconsin Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

633.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Wisconsin Class members' remedies would be insufficient to make Plaintiffs and the other Wisconsin Class members whole.

634.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Wisconsin Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Wisconsin Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

635.    The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

636.    As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Wisconsin Class members have been damaged in an amount to be determined at trial.

### WISCONSIN COUNT III:

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (WIS. STAT. §§ 402.314 AND 411.212)

637.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

638.    Plaintiffs bring this Count on behalf of the Wisconsin Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

639.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

640.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

641.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

642.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

643.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

644.    Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

645.    As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Wisconsin Class members have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this Complaint;

B.    Injunctive and equitable relief in the form of a comprehensive program to repair, retrofit, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class members for all costs and economic losses, and degradation of mileage performance, durability, and reliability that the Class Vehicles will incur by being brought into compliance with federal and state law;

C.    Environmental reparations, mitigation, and remediation to offset the harm caused by the illegal emissions of the Class Vehicles, based on the mileage driven by all Class Vehicles and/or other appropriate matrices of environmental harm;

D.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

E.    Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under Civil RICO, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

F.    Rescission of all Class Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and other fees.

G.    Any and applicable statutory and civil penalties;

H.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded.

I.    An award of costs and attorneys' fees, as allowed by law;

J.    Leave to amend this Complaint to conform to the evidence produced at trial; and

K.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

/s/ Jason B. McGary
Attorney for Plaintiffs

Jason B. McGary ARDC # 6288405
Strong Law Offices
3100 N. Knoxville Avenue
Peoria, Illinois 61603
(309) 688-5297
Fax: (309) 688-5340